THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* LOUIS HOFFNER, Defendant.

County Court, Queens County, November 10, 1952.

*T. Vincent Quinn, District Attorney* (*Peter J. Donoghue* of counsel), for plaintiff.

*Leo P. Healey* and *Harry G. Anderson* for defendant.

FARRELL, J. The defendant moves to set aside a judgment convicting him of the crime of murder, first degree, and (as a consequence of a recommendation of leniency) sentencing him to life imprisonment. The motion proceeds upon the grounds that there has been a deprivation of due process of law in that: (1) there was a suppression of evidence favorable to the defendant, at the trial, and (2) perjury was committed by two of the State's witnesses.

Upon this motion being made, the District Attorney of Queens County, with commendable candor and in exemplification of the highest standards of the office of a prosecutor and in fidelity to

the duty he owes to a defendant as well as to the People, con sented that a hearing be held thereon. Because of the singular nature of the issue involved and in expressed recognition of the rules of law that a motion in the nature of *coram nobis* is the appropriate remedy where there is a claim of deprivation of due process of law dehors the record (*People* v. *Gersewitz.* 294 N. Y. 163, 167), and that where an allegation of fact is made upon which *coram nobis* may properly be predicated and such allegation is not controverted by documentary proof to the contrary, a hearing must be had to determine the issues of fact raised by such allegation (*People* v. *Richetti,* 302 N. Y. 290, 296). A hearing was thereupon held.

So far as the alleged suppression is concerned, the defendant's contention is, in its essence, that had the evidence come to light at the trial, and had the whole truth appeared, the Trial Judge would have had no choice but to direct a verdict of acquittal.

It is undoubtedly true that where the proof in a criminal case clearly fails to come up to the statutory standard of rebutting the presumption of innocence and of establishing guilt beyond reasonable doubt, the court has a duty to intervene and direct an acquittal. (*People* v. *Ledwon,* 153 N. Y. 10, 16–18, 22; cf. also *People* v. *Gluck,* 188 N. Y. 167, 171–172, and *People* v. *Wrieden,* 299 N. Y. 425, 428.) It remains to be seen whether, in fair likelihood, a revelation of the matter allegedly suppressed might have brought this case within the operation of that rule.

From the trial record, it appears that at about 2:35 on the morning of August 8, 1940, a lone gunman attempted a robbery in the barroom section of Christy's Restaurant, Inc., at Jamaica in Queens County. In the place at the time were one Stotzing (a part owner), one Trifon P. Proestos (the deceased) — both of whom were facing the cash register — and one Halkias, a waiter, who was seated in a booth in the rear, facing the bar and the front entrance, with a newspaper on the table before him. As Stotzing and Proestos were checking the receipts, a man entered. On hearing the door open, Halkias looked up from his paper and observed the man walking in, but, assuming that it was a customer, resumed his reading. The individual in question approached and faced the two men at the register, told them it was a holdup and directed them to go to the end of the bar. Halkias looked up in time to witness the attempted holdup and heard the gunman order the other two to "hurry up, turn over or somebody will get hurt." At the trial, he positively identified the defendant as the criminal actor.

Stotzing, leaving Proestos at the cash register, went toward the end of the bar, followed by the would-be robber who then was "walking sideways". When Stotzing gained the vicinity of an archway leading into a darkened dining room, he dashed into that room, threw over a table and took refuge behind it. When the gunman followed, Halkias ran toward the front door while Proestos came from behind the bar and started in the direction taken by Stotzing and his pursuer. Two shots followed, whereupon Stotzing ran back to the barroom (where Proestos was lying on the floor) and grappled with the thug, who, after firing a shot through Stotzing's pocket, made his escape. Halkias, from the concealment afforded by the doorway of a nearby cigar store, observed the assailant flee north on Sutphin Boulevard and turn right into 89th Avenue. This time, however, he saw only the man's back.

Proestos died of wounds inflicted by .45-caliber bullets, and it is of his murder that the defendant has been convicted. The judgment has been affirmed successively in the Appellate Division (262 App. Div. 911) and in the Court of Appeals (288 N. Y. 552), so that the defendant's identity as the criminal is to be regarded as sufficiently established by the evidence *in the trial record*. The claim here, however, is that matter of fact, not of record, would have precluded the entry of the judgment if known at the time. To evaluate the potential of such matter, the evidence as to the defendant's identity must be re-examined.

Stotzing, who struggled with the criminal, would appear to have had the best view of the man, but would not swear that it was the defendant. Not without significance is the circumstance that this defendant had upon his right cheek a visible blemish about the size of a quarter. The fact is not only established by an apparently disinterested physician, who saw the defendant upon the day of the crime, but also by the rogues' gallery photographs of the defendant taken on the occasion of his arrest for the murder. Yet nowhere in the description of the killer is any reference made to such a visible blemish.

Halkias, on the other hand, was positive and would admit to no doubt at all that the defendant was the would-be robber. He estimated his observations as covering a period of about two minutes, but a courtroom experiment showed that what he judged to be two minutes was actually thirty-five seconds. The place of the occurrence was "not too dimly lighted" and, said Halkias, he sat there watching the man's face unexcited, unafraid and calm from the time when the gunman entered until Stotzing made his dash for the dining room. The photographic evidence received at the trial of the murder case pointedly suggests that

Halkias must have had a full-face view of the criminal for at least some part of this period of observation, yet Halkias insisted that at no time did he see any portion except the left side or profile of the killer's face save only for a brief view of the right side, when the criminal quickly turned to follow Stotzing into the dining room.

With life or death depending upon the credibility and dependability of this witness, the defense undertook to impeach him by showing that Halkias had failed to identify the defendant the first time he saw him in a line-up conducted at police headquarters in Jamaica a few days after the crime. Acknowledging his failure to pick out Hoffner, Halkias countered with an explanation that the members of the line-up had faced him directly from a distance of some five or six feet *but specifically denied that he could or did look at the defendant's profile* on that first occasion and asserted that he left the line-up room without having had any such view. After remaining outside for some ten minutes, he re-entered the room and *with Hoffner standing entirely alone,* looked at the latter's left profile for " about a minute ", thereupon identifying him " without hesitation ". Although Halkias claimed that the second or profile view was at his own request, no reason appears why he could not have made that request while all were in the line-up together on the first occasion. Without the identification by Halkias, there could have been no conviction. Its acceptance as credible and dependable by court and jury is imported by a denial of the defendant's request for a directed verdict and by the ultimate verdict itself.

In the hearing conducted by the court upon the present motion, the District Attorney (who, out of a high regard for the real duties of his office, is responsible for the disclosure) came forward with evidence of a fact which, if known at the time of the trial, might well have impelled the Judge who presided there to grant the defendant's motion for a directed verdict. That evidence consists of a transcript of the stenographic record of the proceedings at the line-up, and it clearly establishes that despite his contrary testimony at the trial, *Halkias did have a profile view of all of the members of the line-up at which he failed to identify Hoffner.* With the case depending entirely on this one witness, it is not difficult to conclude that the Trial Judge, informed of so vital an inconsistency, might have justly found the evidence so far below the statutory standard as to require a directed verdict.

That there was a " suppression " of this evidence is convincingly disproved by the trial record. Granting that during a recess earlier in the murder trial, defense counsel may have asked a detective whether any stenographic minutes of the line-up proceedings had been made, and that counsel may have placed reliance upon the detective's negative answer, nowhere does it appear that any similar inquiry was made of the assistant district attorney himself " for the record ".

On the other hand, a reading of the trial record convinces me that occurrences during the trial justify the conclusion that defense counsel should have known that a stenographer recorded the proceedings of the line-up and that a transcript was in existence at the time of trial.

However, this does not dispose of the problem presented. There still remains for consideration petitioner's claim that he was deprived of due process of law in that the prosecutor failed to make available to the defense evidence which would legitimately tend to overthrow the prosecution's case, to wit: the minutes of the line-up, even though no formal request therefor was made. Although the trial record strongly suggests that it might have been the calculated purpose of the trial assistant to satisfy a right sense of justice by making evident the availability of the record (*People* v. *Walsh,* 262 N. Y. 140, 149–150), that, unfortunately, was not enough. There was, in the content of the record, that which could " legitimately tend to overthrow the case made for the prosecution, or to show * * * it * * * unworthy of credence " and there was a resultant duty to give the defense the benefit of knowledge of that element. (*People* v. *Schainuck,* 286 N. Y. 161, 165–166.) There is, in this, no criticism of a public official who, in his lifetime, was distinguished both for his integrity and a wholesome regard for the rights of an accused. None knows better than trial counsel and judges, the difficulties attending decisions under stress and none knows better how often the motives behind such decisions are either doubted or misunderstood. With the security of hindsight, though, it can be said that the duty of revelation existed under the singular facts of this case, particularly since the unproffered minutes of the line-up go to the very heart of the only issue in the case, to wit: identification, even though such failure to proffer was not deliberate, conscious or prompted in any way by improper motive. Had the information been made known, the course of justice might, in fair likelihood, have been completely different.

Thus, it becomes unnecessary to decide whether the witness Halkias was betrayed by poor memory, or whether he was a willful perjurer. Neither is it necessary to decide whether Detective Wrage perjured himself in a denial that he spoke with the witness Brancaccio about this case prior to the trial, though it may be observed in passing that, in any case, the assistant district attorney's attempt to clarify the matter was defeated by the objection of the defense despite the assistant's protest that he wanted to account for Brancaccio's absence and so relieve himself of any charge of failure to produce an available witness.

The motion to vacate the judgment of conviction is, therefore, granted. Settle order upon five days' notice.