[No. 38586. En Banc. November 9, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. FLOYD FRANK WELLS, *Appellant.*[*]

*Max Vincent,* for appellant (appointed counsel for appeal).

*Lincoln E. Shropshire, Patrick H. Olwell,* and *Donald R. Shaw,* for respondent.

[*]Reported in 433 P.2d 869.

HILL, J.—This is an appeal from a conviction on three counts of first-degree forgery.[1] The defendant was sentenced to serve 20 years on each count, the sentences to run consecutively.

The long delays in getting to trial and in getting this appeal perfected were urged upon us as a violation of the plaintiff's constitutional right to a speedy trial. We were urged to release the defendant from custody and to dismiss the charges against him.

■ We have considered the supplementary record, covering the defendant's numerous appearances in the superior court, and are satisfied that the delays complained of were attributable for the most part to the defendant's continuous insistence that he had funds which would soon be available and his desire to retain his own counsel; also to his failure to so retain counsel and prosecute his appeal while he was released on bail.

Having concluded that the defendant Wells was primarily responsible for the delays in getting to trial and in prosecuting this appeal,[2] we now turn to a consideration of the claimed trial errors.

The principal contention at the trial was that the defendant's confession should not have been received in evidence because he had not been advised of his right to an attorney before making the confession.

The trial was recessed while the court considered the admissibility of the confession under Rule of Pleading, Practice and Procedure 101.20W. In disposing of this issue, the trial court found that the officer who took the confession had advised the defendant of his constitutional right to

---

[1] The three forged instruments were counter checks; two for $52 each; one for $53.

[2] One of the Yakima County superior court judges insisted on action when he came to the conclusion that the defendant Wells had been "playing games" with the court—the defendant had been before five judges of that court with his contention that he was about to receive tribal funds.

This presents one of the problems of a multiple-judge court that demands solution.

remain silent and of his right to counsel; and that the defendant had intelligently and knowingly waived those rights.

The court, speaking of the voluntary character of the confession, said:

> No one put any pressure on him. He was not threatened. There was no indication of force. He made the statement and apparently, even under his testimony, he was warned that he didn't have to make the statement, that it could be used against him, and he understood that. It was read to him, he says, and he read it, himself.

The issue of whether he was adequately advised of his right to remain silent and of his right to have an attorney at state expense before he made his confession had to be decided on the divergent testimony of the defendant and the officer who took the confession. The court believed the officer, but gave consideration also to the defendant's prior court experience,[3] saying:

> In addition to this we must take into consideration the fact that this man apparently had been convicted of two felonies in which he was represented by an attorney and apparently, I take it, he was actually tried and went through the process of trial, and apparently statements were involved in those cases.
>
> We don't have a lawyer, a man legally trained, but we do have a man who knows far more than the average about criminal processes.

We are satisfied that the trial court did not err in admitting the confession.

Other assignments of error relate to the failure to give the defendant a preliminary hearing; to the failure to grant a continuance requested by the defendant; to permitting amendments to the information. These are all without merit.

---

[3]The defendant had a relatively extensive criminal record dating back to a commitment as a juvenile to the Training School at Chehalis in 1950, and continuing through to his release from the United States Penitentiary at McNeil Island just a short period before his arrest on the forgery charges with which we are here concerned.

One other claimed trial error remains for discussion—the failure to grant a mistrial when Sergeant LaPierre testified that Chief of Police Olney said to the defendant, "Hello Frank, when are you going to knock this old stuff off?"

Counsel for the defendant immediately objected, and the trial court sustained the objection and ordered that portion of LaPierre's testimony which we have quoted "stricken."

There was no claim of a mistrial at that time, and no request for an instruction to disregard the statement.

It is now urged for the first time that the answer of the witness was so inflammatory as to warrant a mistrial. As indicated, the objectionable statement was stricken.

To hold that the trial court, on its own motion, should have declared a mistrial would be to impeach the intelligence of the jury, which had heard the defendant's objection sustained and the order striking the statement.

Finding no prejudicial trial error and no merit in the claim of a violation of the defendant's right to a speedy trial, the conviction is affirmed.

FINLEY, C. J., WEAVER, ROSELLINI, and HALE, JJ., concur.

FINLEY, C. J. (concurring)—The right to a speedy trial in criminal cases is guaranteed by the Washington State Constitution, article 1, section 22, and by the sixth amendment to the United States Constitution as made applicable to the states by the Fourteenth Amendment. *Klopfer v. North Carolina,* 386 U.S. 213, 18 L. Ed. 2d 1, 87 Sup. Ct. 988 (1967). In *Klopfer,* at 223, the Supreme Court, tracing the evolution of the right to prompt trial, said it "is as fundamental as any of the rights secured by the Sixth Amendment." RCW 10.46.010 provides that a defendant indicted or informed against shall be brought to trial within 60 days from the filing of the indictment or information. If not brought to trial within 60 days, the defendant must be discharged, unless the postponement was upon his own application or for good cause shown.

Considering the foregoing, I am fully aware and appreciative of the significance which our legal system gives to

the right to speedy trial. Nevertheless, I concur with the majority opinion in affirming appellant's conviction in the instant case for first degree forgery. This is for the reason, very simply stated, that considering the circumstances herein, I cannot see how appellant was prejudiced in any meaningful legal sense by the delay in his trial.

Like other basic constitutional guarantees, such as the right to counsel and the right against self-incrimination, the right to a speedy trial *can be waived. State ex rel. James v. Superior Court,* 32 Wn.2d 451, 202 P.2d 250 (1949); *State v. Lydon,* 40 Wn.2d 88, 241 P.2d 202, 57 A.L.R.2d 314 (1952). And, waiver is precisely what appellant's conduct adds up to in this case, for undeniably the delay was essentially his own doing. (*See* Appendix, *infra.*)

The trial judge, in sentencing appellant to three consecutive 20-year terms for each felony conviction, noted as follows:

> The defendant did everything possible to forestall this case . . . .
>
> The undersigned, as sentencing judge . . . is personally aware that on a number of occasions this man has, for reasons best known to himself, caused the trial of his case to be postponed. As a result he was in the Yakima County Jail for upwards of a year and a half pending trial . . . .
>
> Altogether he has been in jail for over two years. Normally I would suggest that this be taken into account in setting his minimum sentence. However, this fellow has appeared to obtain these postponements and to conduct other legal maneuvers simply for the purpose of delaying disposition of this matter.
>
> I feel that he has been trying to play a game with the court; that the delay in the trial of this matter was by his own choice . . . .

The fact that appellant's trial was delayed for nearly a year and a half from the time he was arrested does not ipso facto mean he was denied the constitutional right to a speedy trial. The federal cases quite uniformly hold that delay alone is not determinative. *See, e.g., United States v.*

*Ewell,* 383 U.S. 116, 15 L. Ed. 2d 627, 86 Sup. Ct. 773 (1966); *Hedgepeth v. United States,* 365 F.2d 952, 955 (D.C. Cir. 1966).

In *Ewell, supra,* a delay of 19 months between initial arrest and hearings on later indictments was held not a violation of the right to a speedy trial. The United States Supreme Court stated, *id.* at 120:

> [T]his Court has consistently been of the view that *"The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice."* (Italics mine.)

In considering claims of denial of the constitutional right to a speedy trial, the federal courts have considered whether the delay was purposeful on the part of the state, *United States v. Ewell, supra,* and whether the claimant's trial was prejudiced or in any way unfair because of the delay, *Hedgepeth v. United States, supra.*

In the instant matter, I am convinced that the delays were not purposeful on the part of the state and did not prejudice appellant's defense against the forgery charges in any meaningful sense. Appellant did not even argue that his trial was so prejudiced. Indeed, a large portion of the delay was at his own request, ostensibly to assist in securing witnesses in his behalf.

I concur completely with the majority finding that appellant waived his constitutional and statutory rights to a speedy trial.

But even assuming, arguendo, that appellant's actions in a technical legal sense did not constitute an intentional waiver of his constitutional and statutory rights, I am convinced we would not be justified in discharging him. RCW 10.46.010 plainly provides that trial delay is excusable for good cause shown. It is the responsibility of appellate courts to carefully evaluate not only the rights of the individual accused, but also the rights of society as a whole in each criminal appeal. *An initial question should be asked, namely, what are the objectives of the criminal law and its*

*administration?* Several answers to this question seem obvious. First, the criminal law is society's means of providing protection for the lives and property of its members against criminal, antisocial elements. Closely collateral to the protection of the public is rehabilitation of the convicted criminal in the custodial setting.

> Modern criminology no longer views punishment as the imposition of a penalty, or the exaction of retribution. A sentence in a criminal case looks to the future. Its objectives are to prevent repetition of crimes by the culprit and to dissuade others from perpetrating similar offenses. These ends are sought to be attained, in part, by immobilizing the criminal for some time, thereby making it impossible for him to continue his nefarious activities during that period. A. Holtzoff, *Shortcomings in the Administration of Criminal Law,* 17 Hastings L.J. 17 (1965-66).

The rights of a convicted offender constitute a third factor which appellate courts must consider and evaluate.

Applying the above principles to the instant matter, is it not apparent that several fundamental objectives of criminal justice have been and are being fulfilled? Appellant, a convicted forger, is now serving time in a state prison, where he cannot forge more checks. The public, *i.e.,* merchants and business people, have been and are being protected against appellant's check forging proclivities. The opportunity is presented for appellant's possible rehabilitation in the custodial setting if he will respond and cooperate affirmatively. The trial judge noted:

> The record will indicate this man has previous convictions and the fact that he was out of [the] Federal Penitentiary only a short time before being picked up for the offenses involved in this case. This is one case where I doubt very much if there is any realistic chance for rehabilitation and this is the reason that defendant's sentences on the three counts were made to run consecutively and not concurrently. . . . I feel that here is a convicted person who is unlikely to seriously try to rehabilitate himself, and would suggest a substantially longer minimum than would ordinarily be the case.

Appellant's rehabilitation may be unlikely. It can be noted that while he was out on bail for a short time in 1964 pending trial, instead of attempting to secure counsel and prepare for defense of his case, appellant went to Oregon, where he has since been charged with passing a forged check. In any event, appellant at least has the opportunity to reevaluate his past conduct in terms of future motivation and conduct while serving time in custody as may be determined by the Board of Prison Terms and Paroles. The Board, of course, pursuant to its administrative authority relative to our indeterminate sentence laws, may take into consideration pertinent facts and circumstances in fixing the time appellant will be held in custody.

Balanced against custodial restraint and possible rehabilitation, *i.e.,* society's interests, is appellant's constitutional right to a speedy trial. The latter right could be described as somewhat "abstract" in this particular case, based upon the aforementioned assumption that no prejudice resulted to appellant at his trial because of the delay, and since the delay was not purposeful on the part of the state.

Another approach or judicial evaluation, still assuming that appellant did not technically waive his right to speedy trial, is that the delay was harmless error. And, again, the underlying grounds are that appellant was not prejudiced, and that the delay was not purposeful on the part of the state.

The United States Supreme Court recently recognized the harmless-error rule in constitutional cases in *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 Sup. Ct. 824 (1967).

> We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. *We decline to adopt any such rule.* All 50 States have harmless-error statutes or rules, and the United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for "errors or defects which do not affect the

substantial rights of the parties." 28 U.S.C. § 2111. None of these rules on its face distinguishes between federal constitutional errors and errors of state law or federal statutes and rules. *All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction. Id.* at 21-22. (Footnote omitted.) (Italics mine.)

The United State Supreme Court warned, however, that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24.

In my judgment, the delay in the trial in the instant matter was harmless error, under the guidelines set down in *Chapman, supra,*

> [A]n outstanding defect in the administration of justice today is found in treating as grounds for reversal of a conviction errors that have no bearing on the question of guilt or innocence of the defendant . . . . A. Holtzoff, *supra,* at 28.

The courts too often ignore the harmless-error rule, whether they be faced with constitutional or nonconstitutional errors.[4]

---

[4]In *Chapman, supra,* the Supreme Court of the United States indicated that some constitutional rights may be so basic to a fair trial that their infraction can never be treated as harmless error. One example given was the Fifth Amendment right against self-incrimination through coerced confessions. However, I am most reluctant to subscribe to the proposition that a coerced confession received into evidence can *never* constitute harmless error.

In *Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336 (1963), for example, it is my conviction that the United States Supreme Court's formulation and disposition of the confession issue was both unwise and unnecessary in terms of constitutional theory, application, and judicial function. The case illustrates, in my opinion, that the harmless-error rule could have validly been applied in a case involving the right against self-incrimination.

The evidence in *Haynes* revealed that at 9:05 p.m. on December 19,

The foregoing discussion of the waiver issue and the harmless-error rule should adequately dispose of appellant's claims of constitutional error for lack of speedy trial.

---

1957, the Spokane Police Station received a report that a filling station robbery was in progress. The report was broadcast to police cars working in the area of the filling station. Twenty-five minutes later uniformed officers riding in a police car near the scene observed appellant Haynes walking down a street. Upon questioning, Haynes said that he lived in a nearby house. He walked to the door of the house and fumbled with the door as if to unlock it. The officers remained at the curb watching him, and after a few minutes Haynes walked back to the police car and said, "You got me, let's go." On the way to the station Haynes admitted the robbery, and pointed out the filling station he had robbed. Upon arriving at the police station he made a second oral confession to the officer in charge, revealing that he and his brother had robbed the station and then run away in separate directions. Both Haynes and his brother were positively identified by the owner of the filling station and his wife as the men who had committed the robbery.

The above evidence was admitted without objection at Haynes' trial. (His brother entered a plea of guilty and did not stand trial with Haynes.) Haynes' constitutional claims arose out of the admission into evidence of two signed confessions, which he claimed were involuntarily given. His requests to be allowed to call his wife were denied for approximately 16 hours, and it was during this period that Haynes signed the two dubious confessions.

The United States Supreme Court reversed Haynes' conviction, finding that the confessions had been signed "in an atmosphere of substantial coercion and inducement created by statements and actions of state authorities." *Id.* at 513. The court said, *id.*, 518: "In reaching the conclusion which we do, we are not unmindful of substantial independent evidence tending to demonstrate the guilt of the petitioner." My principal concern is not with the finding that the two written confessions were coerced, although I am dubious as to whether the denial of Haynes' request to call his wife created an atmosphere of substantial coercion. At most it was a very "mild whip." *See Malloy v. Hogan,* 378 U.S. 1, 7, 12 L. Ed. 2d 653, 84 Sup. Ct. 1489 (1964). My critical concern lies in the fact that the court declined to evaluate the probable effect upon the jury of the use of the two signed statements, in light of the overwhelming independent evidence as to appellant's guilt. There was most certainly substantial evidence upon which to find appellant guilty apart from the signed statements. Appellate courts evaluate evidence in this manner in nonconstitutional cases. Why not then in constitutional cases? In fact, the Supreme Court did not hesitate to evaluate the evidence as to whether refusal of permission to call his wife had a coercive effect upon Haynes. Why then could it not evaluate the probable impact of all of the evidence upon the jury?

The very purpose of the harmless-error rule as set out in *Chapman, supra,* is to "block setting aside convictions for small errors or defects

However, further analysis of appellant's rights under RCW 10.46.010 is warranted. The statute reads as follows:

If a defendant indicted or informed against for an offense, *whose trial has not been postponed upon his own*

that have little, if any, likelihood of having changed the result of the trial." Haynes and his counsel must have done some "evidence-evaluating" of their own, and realized that there was little, if any, likelihood of a different result at a new trial, even though the two statements would not have been admissible, for Haynes subsequently entered a plea of guilty to a lesser charge. His brother no doubt did some "evidence-evaluating" when he elected to plead guilty in the first place. Why then cannot such evaluation take place at the appellate level? Excluding the dubious confessions entirely, but considering the other clear, cogent, and convincing evidence against Haynes, what jury could reasonably and rationally have found him innocent and returned a verdict of not guilty? Such situations obviously, or at least in my judgment, should be resolved at the appellate level by application of the harmless-error rule.

It has been suggested that the underlying rationale of the *Haynes* decision was to "police the police," and to hasten the demise of objectionable law enforcement practices. This seems to me a better reason than those stated by the "five-to-four" majority decision of the Supreme Court in Haynes. However, even so, I am far from convinced that reversal of convictions is the best way to accomplish any such worthy aim as upgrading police administration. The social costs outweigh the social gains considerably in my estimation. It is seriously questionable whether any substantial number of policemen on the "firing line," so to speak, have either the time or the inclination to read, study, and try to fathom decisions of the United States Supreme Court in the field of criminal law administration. Meanwhile, society bears the brunt of too much esoteric judicial experimentation, and the burden of new trials in situations which proper application of the harmless-error rule could have prevented. There are other methods of "policing the police" where, and if, necessary.

The late John H. Wigmore observed that the natural way to do justice in such cases would be to enforce the Bill of Rights directly, *i.e.,* by use of contempt of court procedure to restrain overzealous police officers. *See* 8 J. Wigmore, Evidence § 2184a, at 31 n.1 (McNaughten rev. 1961). *See also* A. Bloomenrosen, *Contempt of Court and Unlawful Police Action,* 11 Rutgers L. Rev. 526 (1927).

Other suggestions have been made as follows: (a) legislative establishment of nonpartisan, high-level state commissions relative to police administration to receive complaints of police aberrations and to impose sanctions and award damages in appropriate situations; (b) correlative legislation providing for the admissibility of so-called "tainted evidence" and dubious confessions, and for instructions to juries that their function is to evaluate the evidence considering all pertinent circumstances,

*application,* be not brought to trial within sixty days after the indictment is found or the information filed, the court shall order it to be dismissed, *unless good cause to the contrary is shown.* (Italics mine.)

Although early decisions interpreting and applying the statute make some distinction between (a) constitutional and (b) statutory provisions regarding the right to speedy trial, *see, e.g., State v. Miller,* 72 Wash. 154, 129 Pac. 1100 (1913), it is apparent from later decisions that the statute merely implements the constitutional provision for speedy trial, *see, e.g., State v. Thompson,* 38 Wn.2d 774, 232 P.2d 87 (1951). In equating statutory and constitutional provisions regarding speedy trial, it may be helpful to examine separately the *two statutory exceptions* whereby the 60-day rule does not apply, namely, (1) where the delay is upon the defendant's own application and he is deemed to have waived the right to a speedy trial, and (2) where good cause for the delay is shown, and appellant need not be discharged, even if he did not waive the right to speedy trial.

As to the first exception, we said in *Thompson, supra,* at 782, that "the purpose of the statute was to provide a speedy trial; that it was never intended to provide the means for escaping trial altogether." and further that

> [i]t would seem that appellant is not entitled to blow both hot and cold—to seek dismissal based upon delay in trial, on the one hand; while at the same time, requesting and insisting upon further continuance or postponement of the trial.

Clearly, if appellant's actions in securing delays constituted waiver of his constitutional right to prompt trial, such actions also constituted waiver of his rights under the statute.

As to the second exception, we must determine what constitutes good cause for refusing to dismiss appellant, or, conversely, upon what grounds would there be good cause

---

and to determine the weight and probative value of such evidence; (c) higher standards respecting pay, selection, tenure, retirement, and training which would upgrade the quality of police administration. *See, e.g.,* R. Finley, *"Mapp," The Sacred Cow v. Policing the Police,* Trial, Dec./Jan. 1965, p. 18.

for dismissing him. Clearly, under the statute, if a significant portion of the delay was because of appellant's own actions, good cause exists for sustaining the conviction. And, just as certainly, if the delay was not purposeful on the part of the state, and if appellant was not prejudiced at his trial in any meaningful legal sense by the delay, there is good cause for sustaining the conviction.

The statute was enacted to implement the constitutional guarantee to prompt trial. The recent decision of the United States Supreme Court in *Klopfer*, 386 U.S. 213, 18 L. Ed. 2d 1, 87 Sup. Ct. 988 (1967), makes the question of speedy trial a federal constitutional problem. The body of federal law referred to earlier in this opinion indicates that the right to speedy trial has not been violated unless the delay was purposeful or unless the accused was prejudiced at his trial because of the delay. It is therefore reasonable to expand our interpretation of this statute to embody recent decisional trends concerning the right to speedy trial. In so doing, I would equate the words "good cause to the contrary" as used in the statute with "harmless error." In other words, if the delay caused no prejudice to the appellant it was harmless error, and this is good cause for sustaining the conviction.

It is relevant to note that cases interpreting RCW 10.46.010, as well as a companion section, RCW 10.43.010, hold that dismissal of a *felony* charge for lack of prompt trial is not a bar to subsequent prosecution for the same crime. *See, e.g., State v. Unrein*, 60 Wn.2d 168, 372 P.2d 547 (1962); *State v. Moore*, 60 Wn.2d 144, 372 P.2d 536 (1962); *see also* RCW 10.01.020. If we were to reverse appellant's conviction and dismiss the information, the prosecuting attorney, under above-mentioned state statutes, could immediately re-file the three counts of first-degree forgery. The folly of such action on our part is obvious. Granting a new trial, where there has been no prejudice because of delay at the previous trial, would be an empty gesture as to appellant and a judicial exercise in utter futility considering the un-

derlying philosophy and purpose of the constitutional guarantee of prompt trial.

Despite the foregoing discussion of the harmless-error rule in connection with appellant's constitutional and statutory rights, it should be understood that there should be no hesitation to discharge Mr. Wells if the delay had been purposeful on the part of the state, or if the delay had caused any legally significant prejudice to him at his trial. In either instance the denial of a speedy trial would have been improper and in violation of a basic constitutional right of Mr. Wells. But, to discharge him under the facts of this case would, in my opinion, make a mockery of both the constitutional right to a speedy trial and the appellate function. The delay in this case was harmless error. For the reasons hereinbefore indicated, I have signed the majority opinion and concur in affirming the trial court's disposition of this matter.[5]

## Appendix

November 26, 1963 — Information charging defendant with one count of forgery.

December 2, 1963 — Defendant was arraigned; inquiry was made into his financial status; defendant stated that in about 2 months he would have $6,000 (Tribal Funds, Warm Springs, Oregon).

Trial court determined defendant was able to hire his own attorney. No plea was made until defendant had counsel.

February 4, 1964 — Defendant desired to bail out; appeared before court without counsel but had conferred with Jerry Enright, an attorney, about entering a plea. Defendant had not received his money yet; asked to enter a plea of not guilty which was accepted by the court. Expected money by end of February.

February 25, 1964 — Defendant was able to post $3,000 bond and bailed out.

April 23, 1964 — Back in Yakima jail. Before court for appointment of attorney. Prosecuting attorney conferred

---

[5]Whether appellant should be given credit for time served in jail pending trial is a matter within the administrative discretion of the Board of Prison Terms and Paroles, to be evaluated in relation to other facts and circumstances rationally related to appellant's release from custody and his return to society.

with defendant who stated he did not have sufficient funds to hire attorney; he had funds, but his wife had them tied up.

Trial court appointed William Holst.

May 25, 1964 — Defendant appeared with counsel; trial had been set for later in the week; defendant expected money to bail out. Defendant advised his attorney that he had some witnesses who were unavailable, thus desired to have trial postponed until fall jury term. This request was in writing signed by Wells. Continuance granted; trial to be set for fall jury term.

August 10, 1964 — Defendant appeared with counsel; trial had been set for October 26, 1964. Defendant wanted to argue two motions himself—a demurrer and a motion to set for immediate trial. Motions were continued.

September 3, 1964 — Defendant appeared with counsel and was arraigned on an amended information charging him with 3 counts of forgery. No objection was made to arraignment, because it did not materially change the original charge.

Defendant, after consulting with his counsel, entered a plea of not guilty to all 3 counts. Defendant wished to withdraw his previous motions —granted. Defendant advised the court that he had funds available to hire his own attorney and was going to be bailed out.

Court appointed attorney, then asked to withdraw without objection from defendant; granted.

October 20, 1964 — Defendant appeared pro se on oral motion to have his case stricken from the fall docket; granted. Trial set for January term.

Defendant sought to get bail reduced; denied.

January 6, 1965 — Defendant appeared pro se. Court determined that defendant was indigent and appointed attorney Frank Devine. Trial set for January 27, 1965.

January 20, 1965 — Motion by attorney to strike trial from docket because of unavailability of witnesses for defendant. Counsel in his affidavit supporting motion says defendant "informed me that he has witnesses that can prove his innocence . . . but they are unavailable because of being in a hospital in Oregon, as a result of an automobile accident of recent date."

January 26, 1965 — Trial continued to May 26, 1965.

May 11, 1965 — Defendant's witnesses were subpoenaed.

May 26, 1965 — Trial; subpoenaed witnesses did not appear.

May 27 — Defendant sought to establish alibi as to Count II through witnesses.

Verdict of guilty on all 3 counts.

June 15, 1965      Order to apprehend witnesses.

September 20, 1965      Defendant represented by attorney on hearing on motion for new trial. Prosecuting attorney and defendant's attorney had interviewed witnesses who had not responded to subpoenas; they were unable to support alibi. Motion for new trial denied. Trial judge of opinion that defendant was playing games with court.

October 27, 1965      Defendant appeared with attorney. Trial court rendered opinion on a paper presented by defendant immediately after trial in which defendant claimed the court did not have jurisdiction because crimes were committed on Indian land. Court determined that there was jurisdiction. Judgments on forgery charges were entered.

November 5, 1965      Defendant stated that he had sufficient funds to hire his own attorney and desired to bail out. Appointed counsel was allowed to withdraw.

April 18, 1966      On this date, the Yakima court's patience apparently reached the breaking point. A notice for a motion by the Clerk of the Supreme Court to dismiss the appeal for want of prosecution had been received.

At a hearing before Judge Munson, the prosecutor had explained something of the delays, and that though the defendant was insisting that if his bail was reduced he could make bail, yet he had no money to prosecute an appeal. Judge Munson said:

"Mr. Wells, on November 5th, 1965, Judge Hopp entered an order allowing the withdrawal of your attorney, Mr. Devine. In that order he recites that 'the defendant has stated in open court that he had sufficient money with which to bail himself out of his present incarceration, and, further, that he had money of his own and desired to retain his own counsel. Further, it appears to the Court by the records and files, that Frank Devine was appointed as the attorney for the defendant upon the representation that the defendant had no money with which to employ private counsel and by reason of the representations of the defendant in open court and his acquiescence to this motion, as evidenced by the defendant's signature below, the Court finds that the motion of Frank Devine as attorney of record for the said Floyd Frank Wells will be granted.' "

"Two and a half years in the Yakima County jail is unconscionable. It's your fault—not anybody here. The Court will appoint Mr. Thomas Grahn to

represent you, Mr. Wells. That appeal will be perfected and heard in the Supreme Court of this state within the next year. You have a right to stay in the Yakima County jail until such time as this appeal is decided, or you can at your own request be transferred to the State Penitentiary or to the Director of Institutions to perhaps enjoy a more leisurely confinement than you do in the Yakima County jail. Mr. Grahn can discuss this with you. That will be all."

May 23, 1966    Thomas Grahn was relieved as counsel for Mr. Wells, and Max Vincent replaced him and he prosecuted the appeal and still remains of counsel.

November 28, 1966    Appeal was argued in this court. Opinions and dissents filed thereafter.

May 5, 1967    Order directed to Yakima County Superior Court to file Supplementary Record.

June 6, 1967    Three Supplementary Records filed.

June 12, 1967    Time expired for filing.

LANGENBACH, J.† (dissenting)—Justice is one of the noblest concepts of the human heart. True justice makes no distinction in persons; whether a man is rich or poor, great or small, justice is his due. What follows is not a merely philosophical dissertation. It is a factual account of judicial indifference and official neglect which had the result of inexcusably delaying the prosecution of a wayward Indian for three crudely perpetrated forgeries.

This dissent is based upon the simple ground that the state has denied Floyd Frank Wells that justice which is his due. Official inertia and an almost studied official indifference have denied him his rights both to a speedy trial and to effective legal representation. Defendant was arrested in November 1963. In the interim a cast of five superior court judges, the prosecuting attorney, his deputy, and four attorneys have crossed the stage of action.

The core of the problem is revealed in the following statement made by one of the trial judges:

Two and a half years in the Yakima County jail is unconscionable. It is your fault—not anybody here.

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

I agree completely that there was unconscionable delay in the prosecution of this case. I do not agree that the defendant was the effective cause of that delay.

A reading of the record will reveal beyond peradventure that the factor most relevant to the delay in this case was the failure of responsible officials to make any useful or sufficient inquiry into the extent of the defendant's indigency. When the defendant, upon being proposed the question, stated that he was expecting to receive money in the future, judicial inquiry ended. No attempt was made to plumb the reality of defendant's belief that he would soon be able to hire counsel. The officials, like Micawber, were "fresh and full of faith that something would turn up." As a result the defendant passed years in jail. The court attempted to justify the delays by defendant's consistent belief that wealth was just around the corner. On the other hand, defendant's consistent failure to obtain that money was evident enough to the court that it felt compelled to assign him counsel on four different occasions. The vice of this procedure lay in the fact that each time defendant made a new assertion of imminent prosperity, his appointed counsel were allowed to withdraw (however awkward the position in which this left his defense). The record does not reveal that defendant ever received the large amount of money which he felt was coming. He did obtain enough money in February 1964, to support the issuance of a $3,000 bond under which he was at liberty for 2 months. On this point, the deputy prosecuting attorney stated in April 1964:

Apparently, Your Honor, he has some money, but his ex-wife has it tied up on the coast. He tried to get some, *he did get a little*, but it didn't last very long, he was out on bail. (Italics ours.)

Turning now to a more detailed discussion of the facts, except for 2 months' liberty under bond, defendant has been in jail since his arrest on November 22, 1963. The crucial period is the year and a half which passed between defendant's arrest and his trial in May 1965. What occurred during that period must be viewed against the unquestion-

able constitutional presumption that a defendant is innocent until a jury, at the end of a fair and speedy trial, declares otherwise. Bearing that presumption of innocence most emphatically in mind, we must ask how well this record comports with constitutional concepts of justice in criminal prosecutions.

The original statement of facts, transcript and briefs are deficient in many particulars. This became patent at the departmental hearing and even more so at the later en banc hearing. At the latter hearing numerous assertions were orally advanced by the prosecutor to chink the yawning crevasses. In an attempt more properly to fill those gaps, the superior court was ordered to supplement the record with such data as might be found in its files. Three supplemental records were forthcoming. While these are helpful, it must, in fairness to the defendant, be noted that they contain references to conversations and instruments not of record as well as statements of the prosecutor nowhere substantiated in the transcripts. Nevertheless, we proceed with a very adequate knowledge of what transpired, and more particularly what failed to transpire in the trial court.

Arrested in November 1963, defendant was arraigned December 2, 1963, on an information charging one count of forgery. At that arraignment defendant stated that he wanted an attorney but had no funds with which to hire one. Asked whether he had any money coming from an Indian agency in Oregon, defendant replied:

No, sir, not until February. I won't have no money until February. THE COURT: Well, how much will you have coming then? THE DEFENDANT: About $6,000.00. THE COURT: Six thousand dollars? THE DEFENDANT: Yes, sir. THE COURT: Well, I think you'd better made arrangements to hire your own lawyer. I am sure if you got $6,000.00 coming in February, you can hire a lawyer. Don't you think so, Mr. Prosecuting Attorney? MR. OLWELL: Well, I would think so, Your Honor. THE COURT: Yes. You tell them how much money you got coming in February, and I think you'll be able to hire a lawyer. THE DEFENDANT: Okay. (END OF PROCEEDINGS)

However, the court was overly sanguine because two attorneys thereafter refused to take the case upon mere representations of future wealth.

On February 4, 1964 (70 days after the information was filed and 62 days after arraignment, *see* RCW 10.46.010), defendant, still without an attorney, was again before the court.

MR. OLWELL: . . . He was supposed to have quite a bit of money coming from the Warm Springs Indian Agency. The only reason he is here this morning is so I can make a record of this. It has been quite a while since he has been before the court and I gave him some time to find out if he could get an attorney and then Jerry Enright approached me and he was possibly going to represent the man, so I let the matter go from there. Finally, I went down and talked to him and asked him if he wasn't getting kind of tired sitting down there and he said he was waiting for some money so he could get out on bail, from the Indian Agency, and I thought there ought to be something on the record. THE COURT: What is the situation, Mr. Wells? Apparently, this matter was continued when you were arraigned so you could hire a lawyer. What have you done about it? THE DEFENDANT: Yes, well, I talked to Jerry Enright, and I'm still waiting for my money. My sister-in-law is supposed to bail me out within a week. He wants the money before he takes the case.

On February 25, 1964, defendant bailed himself out under a $3,000 property bond and was at liberty until April 23, 1964. On April 23, the defendant was back in jail and was yet without funds to hire an attorney. The court appointed an attorney to represent him. Five months had passed since the arrest.

In May 1964, the information was twice amended to add two additional counts of forgery without any arraignment. Three days later defendant asked for a continuance to get absent witnesses (whom he felt were important to his defense against the new second cause of action). He appeared with his appointed attorney who stated:

MR. HOLST: . . . He also advises me, Your Honor, that somehow, somewhere he has some money that he

can get ahold of for bail. I told him, "You are not entitled to the services at the expense of Yakima County", so I think if he is bailed out, he should pay for his own counsel.

The court granted the continuance, noting that defendant thereby waived "any benefit or any rights that he may have under the 60 day rule insofar as any Continuance from the present trial setting to the fall jury term is concerned."

In August 1964, defendant appeared in court on his own "demur" and motion for immediate trial. After some discussion these were continued. On September 3, 1964, defendant was finally arraigned on the information which had been amended over 3 months before. Appearing with appointed counsel and pleading not guilty, defendant withdrew his demurrer and motion for immediate trial. Thereupon, his appointed counsel stated:

Mr. Holst: May it please the Court, Mr. Wells advises me this morning that he is going to have a bail bondsman from Seattle bail him out, and also I believe that he told me—that is, Mr. Wells did—that he had some money available. Is that correct, Mr. Wells? Mr. Wells: Yes. Mr. Holst: In view of those circumstances, Your Honor, I would like to be relieved of any further obligation in this matter. If the Defendant has adequate funds to bail himself out, then certainly he is, under the law, I do not believe entitled to have Court appointed counsel. The Court: Mr. Wells, do I understand that you are having yourself bailed out, or expect to have that accomplished very shortly? Mr. Wells: Yes. The Court: And you are paying some bondsman a fee for that, or someone is doing that on your behalf? Mr. Wells: Yes, sir. The Court: Are you paying him yourself? Mr. Wells: I'm not doing it directly, no, sir. My mother is coming. The Court: Do I understand you have some funds available with which you have to hire an attorney, whether it be Mr. Holst or some other attorney, you have such funds available. Mr. Wells: Yes, sir.

The appointed attorney was then allowed to withdraw.

On October 20, 1964, defendant was again before the court. Appearing pro se he sought to have his case stricken

from the fall docket (which was granted) and to have his bail reduced (which was denied). On January 6, 1965, with trial set for January 27, a second attorney was appointed to represent the defendant, he being without funds. But the new attorney was not notified of his appointment until January 16, 10 days before trial! On January 26, 1965, the case was continued until May 25, 1965. On May 25 and 26 trial was had and defendant was found guilty on all three counts. He was sentenced the following October 27 to three consecutive 20-year terms of imprisonment.

On November 5, 1965, an order was entered allowing the second attorney to withdraw. The order recited that defendant had funds to hire an attorney. Defendant, alone, gave notice of appeal in November 1965. Months later, in April 1966, defendant appeared before the court:

> THE COURT: . . . Now, Mr. Wells, do you or don't you have enough money to handle this appeal? MR. WELLS: No, I don't. THE COURT: Do you want a lawyer? MR. WELLS: Yes, sir. THE COURT: From the thickness of the file and your being back here again—you were here a year ago—after having about two attorneys, or three, you are going to get an attorney, Mr. Wells, and that's going to be the man that handles your appeal, and that's going to end it. MR. WELLS: Yes, your Honor. THE COURT: This playing footsies has gone far enough. MR. WELLS: Yes, your Honor.

The court appointed a third attorney, but he was almost immediately allowed to withdraw. A fourth attorney was appointed in May 1966, and he perfected the appeal proceedings.

In November 1966, 3 years from the date of his arrest, defendant was sent to the Washington Corrections Center at Shelton, where the minimum sentences were fixed at 3 years on each count, to be served consecutively. No attention seems to have been paid to the 3 years already served in the Yakima County jail.

The most striking fact about this case is the curious alacrity with which the trial court repeatedly accepted de-

fendant's bald statements that he would be receiving money from the Oregon Indian Agency, or that his mother was going to bail him out or that his sister-in-law was flying to his aid. The initial acceptance of a 2 month delay might be understandable, even though a cursory investigation could disclose serious discrepancies between the time an Indian believes his allotment due, the time it is in fact due and the time it is in fact paid as well as between the amount expected and the amount actually to be granted. But that 2 months' delay was only the beginning.

The record in this case reveals that the trial court failed to perform its duty as set out in the case of *In re Wilken v. Squier*, 50 Wn.2d 58, 61, 309 P.2d 746 (1957):

> The right of an accused to appear and defend by counsel is expressly guaranteed by Art. I, § 22 (amendment 10) of the state constitution. In furtherance of this constitutional guarantee, RCW 10.01.110 and 10.40.030 imposes upon the court three duties: (1) to inform the defendant that it is his right to have counsel before being arraigned; (2) *to ascertain whether because of the defendant's poverty he is unable to employ counsel,* in which event, the court must inform the defendant that the court shall appoint counsel for the defendant at public expense if he so desires; (3) to ask whether the defendant desires the aid of counsel. (Italics ours.)

Had there been an attempt to "ascertain" the true extent of defendant's indigency at the outset, this paltry case would not now be consuming both our time and the last shreds of defendant's constitutional rights to a speedy trial and effective legal representation.[6] It is curious that an attempt should be made to label defendant's optimistic visions of wealth as the cause of the delay when that delay in fact occurred because the court was content to rely upon that optimism rather than perform the duty enjoined upon it in

---

[6]It is also likely that the *early* appointment of an alert and aggressive attorney would have seen defendant pleading guilty to, or at least tried at once upon the initial count. Rather, for three counts of forgery which netted him $104, defendant faces a 60-year sentence after having served 3 years in jail without credit.

*In re Wilken v. Squier, supra.* It would be difficult to mislead a court which had properly performed that duty.

There is a nondelegable responsibility resting upon the court and the state as prosecutor in criminal actions to ascertain promptly and adequately whether, because of defendant's poverty, he is unable to employ counsel. It is their further responsibility to see that such a defendant has timely legal counsel and that the trial of such criminal actions be prosecuted with dispatch.[7] That flagrantly was not the case here. The court's failure to perform its duty resulted in a serious violation of defendant's constitutional right to a speedy trial. To do him adequate justice, under the circumstances of this particular case, the conviction should be reversed and the action dismissed.

DONWORTH, HUNTER, and HAMILTON, JJ., concur in the result of the dissent.

---

[7]Under RCW 10.46.010 if the accused is not brought to trial within 60 days after the information has been filed, the court shall order the case dismissed unless good cause is shown. This statute should be construed strictly in favor of the accused, especially if he is an indigent and is unable to secure his release on bail. Otherwise, long periods of imprisonment without a judicial finding of guilt might become the lot of poor and obscure defendants regardless of how innocent they are presumed. It is the duty of the state to expedite such trials in a speedy manner. There is no reason why, in the exercise of good judgment and discretion by the court and prosecutor, such cases should not be set for trial during the current and pending jury terms.