Mitchell D. Schweitzer, J.
This is a proceeding for a writ of error coram nobis to vacate a conviction for the crime of manslaughter in the first degree, and a hearing thereon has been completed. The defendant (hereinafter referred to as the petitioner) was so convicted by a jury and was sentenced on November 13, 1933 to State prison for a term of not less than 15 years nor more than 30 years. He was released on parole in October, 1944 and has since maintained this status, the parole period to expire in 1963.
The petition is based on two charges: first, that the prosecution withheld evidence, to wit, statements taken at the place of the homicide which, if disclosed, would have brought about a different verdict; and, second, that People’s Exhibit 2, a gun, was improperly put in evidence as the District Attorney knew at the time that Exhibit 2 never caused the death of the deceased. As to the second allegation, one of the People’s witnesses at the trial identified the gun as the one held by the petitioner, which he thereafter dropped and which was picked up by Joe Hinchey at the time and place of the homicide. However, three years later the trial District Attorney submitted an affidavit in opposition to the petitioner’s motion for a new trial in which he stated under oath that the People never contended that the bullet found in the body of the deceased came from either of the two guns which were retrieved from the Harlem Eiver and, “what became of the gun that was used by the defendant Fisher, the People do not know.” The petitioner claims that this constituted a fraud and misrepresentation on the court and jury and which, being a fact outside the record for which no adequate remedy at law existed, entitles the petitioner to a' vacatur of the conviction.
The Court of Appeals ordered a hearing o>n these issues (People v. Fisher, 4 N Y 2d 943, 945) “ upon the ground that questions of fact are presented.”
A proper appreciation of the issues requires a review of the background of the case.
*393 The petitioner was indicted for shooting and killing one David Feldman at the Belden Social Club on January 28, 1933. The club was actually a ‘ ‘ speakeasy ’ ’ run by one Peter Moran at the southeast corner of 124th Street and Second Avenue. It was a two-room affair, one flight up, the entrance on Second Avenue opening into a sitting room where musicians played and people danced. A bar was located in the room to the rear, also a toilet which had an exit leading through a basement into 124th Street.
The People contended that an argument arose in the sitting room and that Fisher fired across the room at one Hugh Mulligan but that David Feldman, who was standing near Mulligan, was shot and killed. Mulligan then fired at Fisher but struck one Hugh Clark, who later died. Fisher denied having a gun or shooting at anyone and maintained that he had been assaulted and stabbed in the barroom outside the toilet door by an unknown assailant and that he first heard shots after he was helped out through the toilet exit, but that he was stabbed while in the vicinity of and in the toilet and again on 124th Street.
The People’s proof, in part, consisted of the testimony of Dr. Helpern, the Medical Examiner, who described the two wounds in Feldman’s body, either of which could have caused death. He testified that the bullet which caused the trunk wound was recovered from Feldman’s overcoat, while the bullet which inflicted the second wound was not found. Patrolman Boudreau testified that on January 28, 1933 he noticed a number of people running out of 2418 Second Avenue and as he tried to get in he was forced back. He then went around to 124th Street and saw two men, one lying on the street and the other standing above him and apparently punching him. The standing man fled and he then saw Fisher get up from the ground, come over to him, and asked him to call an ambulance which he did. He then went up to the ‘1 speakeasy ’ ’ and found Clark unconscious on the floor in the sitting room and the body of Feldman in the barroom. He also found a small fully loaded automatic revolver on the floor about two feet from Feldman. (This gun was not admitted in evidence.) He accompanied Clark and Moran to the hospital. White and Perry were two musicians who were playing in the sitting room, and they testified about a commotion and a shot being fired and seeing Fisher with a gun in his hand and then seeing Mulligan shoot in Fisher’s direction. They both testified that Mulligan and Fisher threw their guns to the floor. White said he heard the shot come from Fisher’s direction and that although he could *394 not identify tin gun. Exhibit 2 “ looked like ” tin gun Fisher had in his hand, which was pointed toward the barroom» He did identify the guns at one point in his testimony. He saw Fisher leave through the front door and Mulligan hit him at the time. Perry testified that after he heard the shot, hi saw people grappling with Fisher. He further stated he did not see anyone out or stab Fisher and that Joe Hinchey, the bartender, picked up the gnns. Joe Hinchey testified that when he was in the barroom he heard two shots; he then went into the sitting room, heard another shot and then turned and ran out through the barroom toilet exit. At the time he heard the two shots hi saw two or three -fellows grappling with Fisher near the toilet door, and Fisher put Ms hand in his inside breast pocket as if to ‘* draw a gun that he picked up a gun at the toilet door and another on the lower floor at 124th Street. He took them home» The guns he picked up looked like Exhibits Ú, and 3» James Hinchey, the bartender ’s brother, testified that he found the two gnus in his home 'and he dropped them into the Harlem Elver at -139th Street and that People’s Exhibits 2 and 3 looked like the guns he threw into the river» Detective Andrew O’Connor told how the guns were retrieved from the river and identified Exhibits 2 and 3 as the same guns» They were then received in evidence.
The petitioner testified in his own defense and the substance of his testimony has already been alluded to. He also described in detail the wounds inflicted on him and his period of hospitalization. Moran testified as a defense witness and stated that at about 2:00 jvm five fellows Came in with what looked like guns and Said, <e Stick up, stick them up.” Fisher, Mulligan and Feldman were already there. He heard six or 'seven shots and he ducked behind the bar but was shot in the leg. He saw Fisher on the floor near the bar. He did not see Mulligan or Fisher shoot at each other and did not see Joe Hinchey pick up any guns. There Were other witnesses for the defense but their testimony is not germane»
Statements were taken from several persons in the premises by Assistant District Attorney Joseph Gohn and some of these people wire detained 'as material witnesses. A statement was given by John Newerla, relating certain events concerning Ms entrance and egress from the- barroom toilet» Detective Andrew 0 ’Connor also made a statement which included something told him by Patrolman Boudreau, which will fee referred to later in connection with Newerla’¡s statement.
The petitioner made a motion in 1934 for a new trial based on newly discovered evidence in wMeh he claimed that the *395 guns retrieved from the river and admitted in evidence as People’s Exhibits 2 and 3 did not cause the death of Feldman. His offer of proof, although interesting, is not pertinent to this inquiry. This is the time when the Assistant District Attorney, who tried the case, swore in a 1936 affidavit that it was never contended that the guns introduced in evidence were the guns used in the homicide and that the People did not know what became of the gun used by Fisher. The motion was denied.
It is of interest to note that Mulligan was indicted for the slaying of Clark, but was not apprehended until Fisher was sentenced. His bail was discharged in December of 1934 on recommendation of the District Attorney on the grounds that White and Perry could not be located and that Fisher fired the first shot.
The charge of suppression of evidence favorable to the defense has arisen from the disclosure of certain statements made by John Newerla and Detective Andrew O’Connor to Assistant District Attorney Cohn soon after the shooting on January 28, 1933, and which were not known to the defense at the time. These statements, among others, were turned over to the defense counsel, Mr. Moore, by the District Attorney’s office in January of 1956 in connection with the instant proceeding.
The petitioner claims that these statements bear out his defense that he was not in the Belden Social Club at the time of the shootings, and if they had been made available at the time of the trial, they would have been used to advantage by his counsel. By way of mention, Newerla was arrested as a material witness and released on bail but never testified before the Grand Jury or at the trial, nor was he ever interviewed by defense counsel. Detective Andrew O’Connor was the officer in charge of the case and he testified both in the Grand Jury and at the trial.
The substance of Newerla’s statement was that he was in the barroom toilet and as he came out, he heard a shot, and a fellow flopped at and on his feet. This concededly was Feldman. He lifted the man off Ms feet, turned around, went back into the toilet and made his exit from the building through the basement and out to the street. His statement further narrated that when he came out on the street, he spoke to a policeman and there was a man lying on the ground near the policeman. These persons were admittedly the petitioner Fisher and Patrolman Boudreau.
Detective O’Connor’s statement in part recounted a conversation he had with Patrolman Boudreau in wMch Boudreau *396 allegedly told him that he had been standing in front of the premises when he saw Fisher running down and two or three men fighting with him, and as Boudreau went over, he heard shots.
Newerla testified at the coram nobis hearing. He remembered some of the events of January 28, 1933, and averred that his statement of that date was the truth, and that he had gone into the toilet and was there about two or three minutes. Detective O’Connor and Patrolman Boudreau are deceased.
The suppression or withholding of material evidence by the prosecution which is favorable to a person accused of crime is a violation of due process of law and renders a conviction void. It stands on the same footing as would the knowing use of perjured testimony “ to procure the conviction and imprisonment of a defendant and is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.” (Mooney v. Holohan, 294 U. S. 103, 112.)
Our Court of Appeals has stated in People v. Fielding (158 N. Y. 542, 547), that “ a public prosecutor, * * * is a quasi-judicial officer, representing the People of the state, and presumed to act impartially in the interest only of justice.”
While rare, instances have developed where convictions have been set aside by way of coram nobis to remedy such an injustice. (People v. Steele, 65 N. Y. S. 2d 214; People v. Riley, 191 Misc. 888; People v. Hoffner, 208 Misc 117; see Frank, Coram Nobis, p. 30 et seq.)
However, it is incumbent upon the petitioner to prove by a preponderance of the evidence that material evidence was suppressed. I have examined the trial minutes in this case and having held a hearing on this feature of the petition, find that under the facts and circumstances there was no suppression of material evidence regarding the Newerla and O’Connor statements. Newerla’s statement and his testimony on the coram nobis hearing merely stand for the fact that around the time of the shooting no one besides himself was in the toilet and that this condition obtained while he departed from the “speakeasy” through the toilet exit. Further, that when he came into the street, he went over to Patrolman Boudreau and a person (coneededly Fisher) was lying on the ground. Fisher stated on the trial that he first heard shots while he was past the toilet and going out to the street. He testified at the coram nobis hearing that he heard two shots while he was in the basement and for the first time stated that he heard Patrolman Boudreau say “there goes four shots” while he (the peti *397 tioner) was on the street. Insofar as the four shots are concerned, he stated to this coram nobis court that he never told his trial counsel about the four shots and that he never remembered the four shots until two years ago when he first saw the statements of the witnesses. O’Connor’s statement may be disregarded as pure hearsay based on what Boudreau allegedly told him.
Boudreau never testified either before the Grand Jury or at the trial to hearing any shots. In fact, in his statement to Mr. Cohn on January 28, 1933 he answered “ No ” to the question “ Did you hear any shots? ” The witness White testified at the trial that he saw Fisher leave through the front door.
Talcing Newerla’s statement at face value, it casts serious doubt on the petitioner’s trial and coram nobis hearing testimony that he went out of the premises through the toilet exit immediately before any shooting took place. Newerla’s recitation of the facts surrounding his presence in the toilet conflicts with the petitioner’s contention. It is difficult to conceive how the Newerla statement would have been of any material value to the petitioner. Bather than constituting the suppression of material evidence, Newerla’s 1933 statement might conceivably have given the prosecution good cause to call him as a rebuttal witness at the trial.
The second issue presented in this proceeding involves the alleged improper offer and receipt in evidence of a Colt .38 caliber gun, People’s Exhibit 2. The defense objected to the admission of the gun in evidence at the trial on the ground that there was no evidence to connect the petitioner with it. Defense counsel likewise objected to the acceptance in evidence of People’s Exhibits 1, 3, 8 and 9 on the same ground.
Alleged errors of law committed during the trial are matters of record and are subject to review by appeal and not coram nobis (People v. Sadness, 300 N. Y. 69; see Frank, Coram Nobis, 1957 Supp., p. 54 for examples). Petitioner’s counsel in this proceeding maintains that the acceptance in evidence of the gun was not an error in law on the record at the time of the trial, but that “ subsequent events,” that is, the prosecutor’s 1936 affidavit, stamped the gun with the taint of incompetency and rendered, it inadmissible in evidence ab initio. That inasmuch as the facts contained in the prosecutor’s affidavit were dehors the record in 1933 and known only to him, the error could not have been raised on appeal. The Court of Appeals evidently saw merit in this argument, as this hearing was ordered on questions of fact (People v. Fisher, 4 N Y 2d 943).
*398 It must be stressed that although the two guns, People’s Exhibits 2 and 3, were examined by the ballistics bureau of the Police Department and that the late Sergeant Butts concededly made or attempted to make comparison tests between the test bullets fired from these guns and the bullet found in Feldman’s overcoat (People’s Exhibit 1), no evidence was offered on the trial regarding this matter. Lieutenant Bolger (now retired) testified at the coram nobis hearing that he made certain test firings with the guns in 1933, but it was Sergeant Butts who would make the microscopic comparisons. Bolger further stated that Sergeant Butts’ practice was to make a report of his findings directly to the Chief of Detectives. The ballistics bureau produced certain records at this hearing which it still had in connection with the case, but none contained any findings by Sergeant Butts. Neither Lieutenant Bolger nor Detective Vincent O’Gorman could state at the hearing whether the bullet, People’s Exhibit 1, was fired from People’s Exhibit 2, although they both agreed that the gun could fire such a bullet. Detective O’Connor said that there were no records in the bureau which showed that People’s Exhibit 1 was not fired from People’s Exhibit 2. Lieutenant O’Gorman testified that the test bullets fired from People’s Exhibit 2 were still in the possession of the ballistics bureau and he produced them. He stated that a Colt .38 like People’s Exhibit 2 has a left twist with six lands and six grooves and that People’s Exhibit 1 had a left twist of 6, and that it could have been fired from People’s Exhibit 2.
Within this context, it is interesting to note that at the time of the trial the late Detective Andrew O’Connor made reference to what appeared to be powder marks on Feldman’s clothes, but this testimony was stricken out after objection by the trial District Attorney on the ground that he was not an expert. The following colloquy then took place:
“ The Court: Are you going to call any expert, any ballistic expert?
“Mr. O’Brien: Pursuant to Mr. Hogan’s request we will produce the clothes here.
‘ ‘ Mr. Hogan: Are you going ,to call the ballistic expert in this case?
‘ ‘ Mr. O ’Brien: I say we will produce the clothes.
“Mr. Hogan: I ask, in the interest of justice, whether or not the District Attorney * * *
“ The Court: Now, in the first place, we do not know how clear the officer is in his judgment as to whether the man wore a coat or an overcoat.”
*399 No further mention was made of the production of the ballistics expert, although it appears that this colloquy related to the powder burns only.
It was stipulated on this hearing that Sergeant Butts either made or attempted to make a microscopic comparison regarding People’s Exhibits 1 and 2. The only logical conclusion which I can draw from the failure of the prosecution to call Sergeant Butts as a trial witness is that he would have testified that he could not state that People’s Exhibit 1 was fired from People’s Exhibit 2. His answer could only have been one of three; either that Exhibit 1 was fired from Exhibit 2, or that it was not so fired, or because of mechanical reasons a comparison could not be made.
The exhibits were admitted into evidence over defense objection with the court’s observation “ and it is for the jury to find as a fact whether this defendant used one of the guns ’ ’ and “ You have a chain of circumstances here, Mr. Hogan, which makes these guns admissible.” The court further stated when People’s Exhibit 1 was admitted in evidence over objection, “ The all important question is this: if this defendant fired in the direction of Mulligan, whether the bullet which was discharged from the revolver held by him aimed at Mulligan missed fire and struck Feldman. That is a question of fact for a jury to determine. They cannot indulge in guesswork. They must be satisfied beyond a reasonable doubt that the defendant discharged the firearm which produced the death of Feldman.” People’s Exhibits 8 and 9 were admitted in evidence at this time. Exhibit 8 consisted of three discharged shells and three loaded shells which were found in Exhibit 2, and Exhibit 9 consisted of two discharged shells and three loaded shells found in Exhibit 3 at the time the guns were recovered from the Harlem Biver.
The respective summations of counsel were not included in the trial record. There is no way of telling at this date what reference, if any, the District Attorney made to People’s Exhibit 2, except for what Fisher testified to on this hearing. Fisher stated he recalled a part of the summations and the following questions and answers constitute part of the coram nobis hearing record:
‘ ‘ Q, Do you recall anything said by Mr. 0 ’Brien in his summation in connection with the gun, which at the trial was known as People’s Exhibit 2? A. I do.”
* * *
“ Q. 'Will you state it? A. During the trial the prosecutor Miles O’Brien, held in his band a large, black .38 caliber pistol. *400 He said, ‘ This is the gun with which the defendant Fisher killed the deceased Feldman, but we cannot prove it because the gun was in the bottom of the East River and got rusty, but this is the gun.’ ”
The prosecutor testified at this hearing that he had no recollection of what he said during his summation in reference to the guns received in evidence. He further stated that the contents of the 1936 affidavit was his best recollection at the time he made it, and “ It was true if I made it. If it wasn’t true, I wouldn’t have put it in the affidavit.”
I am constrained to accept the contents of Mr. O’Brien’s 1936 affidavit submitted in opposition to the then pending proceeding for a new trial so far as it reflects his conduct on the original trial in 1933.
The issue before me now is to determine whether the offer of People’s Exhibit 2 in evidence by the prosecution, with knowledge that it was not the gun used in the homicide, is sufficient to vacate the petitioner’s conviction. The trial court charged the jury that, “ If you find that this defendant had a revolver in his hand pointing in the direction of the rear room and discharged that revolver, did the bullet that was discharged from the revolver of the defendant penetrate the body of Feldman and from the effects of which Feldman died ”.
At the risk of being redundant, I must again point out that there was no ballistic testimony to connect the bullet found in Feldman’s coat with People’s Exhibit 2. While the testimony of the musicians gives rise to the conclusion that Fisher fired across the room at Mulligan, and vice versa, a disturbing element emerges in the form of an affidavit dated July 8, 1958 submitted by Dr. Milton Helpern in connection with the Clark autopsy, which was admitted in evidence on this hearing. Dr. Helpern stated therein that ‘ ‘ the muzzle of the gun from which the shot was fired was in contact with the point of entry. ” Thus the contention of the prosecution based on the musicians’ testimony that cross-fire between Fisher and Mulligan caused the deaths of 'Feldman and Clark appears to be refuted (insofar as it relates to the Clark homicide) by physical evidence. While Clark’s death is not involved in this proceeding, it arose out of the same incident which caused Feldman’s death.
It is not the function of a coram nobis court to re-examine the sufficiency of the evidence adduced on a trial, as statutory remedies are available for such purposes.
It is, however, the obligation of a coram nobis court, where allegations have been presented which come within the ambit of coram nobis relief, to inquire into the facts and circumstances *401 surrounding a trial, to determine whether or not a deprivation of due process of law has resulted because of some alleged fraud practiced on the court and the person charged with crime (see Frank, Coram Nobis, ch. 2, p. 11).
There is no question in my mind that if the facts contained in the prosecutor’s affidavit were known to the court at the trial, People’s Exhibits 2, 3, 8 and 9 would not have been admitted in evidence. Certainly the effect of the musicians’ testimony, together with the admission of People’s Exhibit 2 in evidence, seriously prejudiced the mind of the jury as to the human agency and the criminal means which caused Feldman’s death. The trial court made it a question of fact for the jury to determine whether or not Fisher fired a gun which resulted in the death of Feldman. Absent any ballistic proof, a fortiori, the admission of People’s Exhibit 2 must have influenced, nay convinced, the jury that this was the murder weapon used.
The prosecutor’s 1936 affidavit stated: “ The evidence in reference to these guns was brought out on the trial in order to show that certain guns were found on the premises. What became of the gun that was used by the defendant, Fisher, the People do not know.” Aside from the petitioner’s own recollection of what the prosecutor allegedly said during his summation, the trial record is barren of any reference which would have explained the introduction of the gun except for the irresistible conclusion that it was the murder weapon.
In People v. Savvides (1 N Y 2d 554) a conviction was 'set aside on appeal because the District Attorney sat by idly while the main prosecution witness stated to the court and jury on cross-examination that he expected no consideration for testifying against his accomplice. The fact was that he had,the assurance of the same District Attorney that he would be permitted to withdraw his plea of guilty to the same crime for which the defendant was being tried, and plead to a lesser crime. The Court of Appeals held (pp. 556-557): “The conviction cannot stand. The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach. The prosecutor should have corrected the trial testimony given by Mantzinos and the impression it created. He should have, by immediate statement of his own or by further appropriate examination of Mantzinos, forthrightly exposed the lie, so that the court and jury would have known that the witness had reason to expect lenient treatment for ‘ continued * * * co-operation ’. His failure to do so constitutes 1 error so fundamental, so substantial, ’ that a verdict of guilt will not be permitted to stand. (People v. Creasy, 236 N. Y. 205, 221.)
*402 “It is of no consequence that the falsehood bore upon the witness’ credibility rather than directly upon defendant’s guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. Ñor does it avail respondent to contend that defendant’s guilt was clearly established or that disclosure would not have changed the verdict. The argument overlooks the variant functions to be performed by jury and reviewing tribunal. ‘ It is for jurors, not judges of an appellate court such as ours, to decide the issue of guilt,’ (People v. Mleczko, 298 N, Y. 153, 163.) We may not close our eyes to what occurred; regardless of the quantum of guilt or the asserted persuasiveness of the evidence, the episode may not be overlooked. That the district attorney’s silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.
‘ ‘ Although, in the view we have taken, it may not be necessary to determine the actual effect of the prosecutor’s conduct, the resulting prejudice to Sawides may not be characterized or discounted as harmless.”
The guilt or innocence of the petitioner is not in issue in this proceeding. The question of due process of law as it relates to cor am nobis relief is the issue. I find that the offer and receipt of People’s Exhibit 2 in evidence at the trial was so prejudicial because of the facts stated in this opinion that the petitioner’s constitutional right to a fair trial was destroyed.
Whatever the reason for the offer of this tainted evidence, ‘1 there are certain immutable principles of justice which inhere in the very idea of a free government ” (Bolden v. Hardy, 169 U. S, 366, 369) which no court may disregard.
The motion is granted and the conviction of the petitioner William Fisher for the crime of manslaughter in the first degree is set aside.
The petitioner will be arraigned in Part I of this court on the indictment as soon as practicable. Enter order.