[No. 39376. Department Two. March 6, 1968.]

THE STATE OF WASHINGTON, *Respondent,* v. RONALD E. DAVIS *et al, Defendants,* JAMES L. BELKNAP, *Appellant.*\*

\*Reported in 438 P.2d 185.

*Hamblen, Gilbert & Brooke, Wm. F. Nielsen,* and *Harold D. Clarke,* for appellant Belknap (appointed counsel for appeal).

*George A. Kain* and *Donald C. Brockett,* for respondent.

NEILL, J.—Defendant Belknap, along with three codefendants, was convicted of attempted escape (RCW 9.31.010). In 1966, the authorities of the Spokane County jail, in which Belknap was incarcerated, were informed that an attempt to escape was being made. Investigation revealed a partially sawed hole in the metal floor of the common exercise area adjoining the prisoners' cells. Several pieces of hacksaw blade were found on one of Belknap's codefendants. The jail authorities questioned the inmates, including Belknap, some of whom gave oral and written statements.

A pretrial confession hearing, held pursuant to CrR 101.20W, established the following undisputed facts: (1) after discovery of the attempted escape, a sheriff's captain had a conversation with Belknap; (2) an undersheriff was present at, but did not participate in, this conversation; (3) the captain informed Belknap of his constitutional rights as required by *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 Sup. Ct. 1602 (1966); (4) Belknap understood his rights; and (5) Belknap was requested to give a written statement which he refused to do.

Other material factual details surrounding this conversation are in dispute. The sheriff's captain testified that: (1) after being informed of his rights, Belknap stated that he understood them, that he would waive his rights, would answer questions he felt it was wise to answer and would refuse to answer questions he felt it was unwise to answer, unless his attorney would be present; (2) defendant was told that the authorities knew he had not sawed on the floor but that he had sawed on a table brace; (3) Belknap replied that four men were involved in the attempt and

that he had played his part by sawing on the table brace and acting as a lookout; (4) Belknap was requested to give a written statement; (5) he requested time to consider whether he would do so or whether he would consult his attorney first; (6) Belknap later informed the captain that he would not do so; (7) the captain did not know Belknap had an attorney; (8) Belknap did not request an attorney at any time prior to making the oral admissions; (9) Belknap was not told that charges might not be brought if he cooperated. Conversely, Belknap testified that: (1) after being warned of his rights, he told the captain that he would not say anything until he talked with his attorney; (2) he was informed that the captain had learned, from other inmates, of Belknap's part in the escape; (3) the state might not prosecute if Belknap cooperated; (4) the captain asked if it was true that defendant had sawed on a table brace and acted as a lookout; (5) Belknap replied that he would not answer until after consulting his attorney; (6) Belknap informed the captain of the name of his attorney; (7) Belknap informed the captain that he had no statement to give, written or otherwise. The trial court believed the captain's version of the disputed facts and ruled that Belknap's alleged admissions were voluntary and admissible.

At trial Belknap renewed his objection to the captain's testimony as to the admissions, but it was admitted. Independently of the admissions, testimony of other inmates of the jail was that Belknap: (1) indicated to other inmates his participation in the escape attempt; (2) assisted in camouflaging the hole; (3) acted as a lookout; (4) helped other inmates muffle the noise of sawing the hole; (5) sometimes kept the hacksaw blades; and (6) sawed on a portion of a table used as a brace in the escape hole.

Belknap appeals. He first argues that because he denied the captain's version of the alleged admissions and because an undersheriff who was included in the list of the state's witnesses was neither called by the state nor his absence explained even though the undersheriff was present during the interrogation, the trial court erred in refusing to instruct the jury on the "missing witness" rule, i.e., the fail-

ure of the state to produce the undersheriff as a witness to verify Belknap's waiver of his constitutional rights raised an inference that his testimony would have been unfavorable to the state's case. This rule was defined in *Wright v. Safeway Stores, Inc.*, 7 Wn.2d 341, 346, 109 P.2d 542, 135 A.L.R. 1367 (1941), quoting from 10 R.C.L. 884, § 32, as follows: (*cf.* 29 Am. Jur. 2d *Evidence* § 178 (1967))

" . . . it has become a well established rule that where evidence which would properly be part of a case is within the control of the party whose interest it would naturally be to produce it, and, without satisfactory explanation, he fails to do so,—the jury may draw an inference that it would be unfavorable to him. . . ."

█ In answer to this assignment of error, the state first argues that the failure to call the undersheriff was explained to Belknap's counsel during a recess of the trial. However, although the state's explanation appeared in its brief on appeal, there is nothing in the trial record to substantiate this explanation. This court has consistently held that cases on appeal must be decided on the record made in the trial court (*Lally v. Graves*, 188 Wash. 561, 63 P.2d 361 (1936)) and that we can only consider evidence presented in the record (*Falcone v. Perry*, 68 Wn.2d 909, 915, 416 P.2d 690 (1966); *Tyree v. Gosa*, 11 Wn.2d 572, 579, 119 P.2d 926 (1941); *Dibble v. Washington Food Co.*, 57 Wash. 176, 106 Pac. 760 (1910)). Therefore, for the purpose of considering this issue, we must assume that the state's failure to call the undersheriff was unexplained at the time of trial.

█ The state next argues that the "missing witness" rule does not apply in the instant case because the undersheriff was equally available to either party; or stated another way, the rule only applies when the uncalled witness is "peculiarly available" to one of the parties. A witness, however, is not "equally available" merely because he was physically present at the time of trial or could have been subpoenaed by either party. As was said in *McClanahan v. United States*, 230 F.2d 919, 926 (5th Cir. 1956):

. . . "the availability of a witness is not to be determined from his mere physical presence at the trial or his accessibility for the service of a subpoena upon him. On the contrary, his availability may well depend, among other things, upon his relationship to one or the other of the parties, and the nature of the testimony that he might be expected to give . . . ." Deaver v. St. Louis Public Service Co., Mo.App., 199 S.W.2d 83, 85.

For a witness to be "available" to one party to an action, there must have been such a community of interest between the party and the witness, or the party must have so superior an opportunity for knowledge of a witness, as in ordinary experience would have made it reasonably probable that the witness would have been called to testify for such party except for the fact that his testimony would have been damaging. The rationale behind this definition of the "availability" of a witness is aptly summarized in 5 A.L.R.2d 895 (1949), as follows:

If such an inference is to be drawn it becomes necessary to determine which of the parties to the action should have called the witness in order to determine who should bear the onus of the adverse inference or presumption. . . . one of the factors which determines this question is the relationship which the potential witness bears to the parties, the logical inference being that a person will be likely to call as a witness one bound . . . [to] him by ties of interest or affection unless he has reason to believe that the testimony given would be unfavorable, and that a party closely connected with the witness will be *more likely to be able to determine in advance what his testimony will be if he is called.* On the other hand, a party should not be required to call a witness likely to favor his opponent's case, *since by so doing he must ordinarily vouch for his credibility and lose his opportunity to impeach or cross-examine the witness.* (Italics ours.)

We are of the opinion that, under the facts of the case at bar, the uncalled witness was not equally available to either party as argued by the state, but rather was "peculiarly available" to the prosecution as these words are defined above. The uncalled witness was a member of the

same law enforcement agency as the testifying officer. He was the only other witness to the interrogation. The law enforcement agency of which he was a member was responsible for investigating and gathering all the evidence relative to the charges made against Belknap. The uncalled witness worked so closely and continually with the county prosecutor's office with respect to this and other criminal cases as to indicate a community of interest between the prosecutor and the uncalled witness.

■■ The state's next argument is that the missing witness rule does not apply in the instant case because the testimony of the uncalled witness, the undersheriff, would merely have been "cumulative." The state relies on *Wright, supra,* in which we said at 347, quoting from 10 R.C.L. 886 § 33: (*cf.* 29 Am. Jur. 2d *Evidence* § 186 (1967))

> "The presumption arising from a failure to call a witness applies only to witnesses . . . whose testimony would not be trivial, or to be classed as merely cumulative, but important and necessary."

Similarly, Professor Wigmore has stated in 2 Wigmore, Evidence § 287 (3d ed. 1940):

> [I]t seems plain that possible witnesses whose testimony is for any reason comparatively *unimportant,* or *cumulative,* or *inferior* to what is already utilized, might well be dispensed with by a party on general grounds of expense and inconvenience, without any apprehension as to the tenor of their testimony.

But, like all general rules, this limitation on the missing witness rule has its exceptions. Wigmore qualifies this limitation by saying that it depends on the facts of each case for its application and that it "should not be enforced with any strictness; otherwise it would become practically objectionable . . . ." Wigmore, *supra,* § 287. Wigmore further indicated that, although "it is commonly said . . . that the prosecution's failure to call an eye-witness is not open to inference" since no rule requires "that all *eye-witnesses* shall be called;" nevertheless "*there can be no such general principle, for sometimes the inference would be well founded.*" (Italics ours.) Wigmore, *supra,* §

290(1). Had the potential testimony of the undersheriff related to some minor factual issue or even to one of the elements of the crime with which Belknap is charged, we could well accept the state's argument on this point. However, the disputed issue of fact to which the undersheriff's testimony would have related—the validity of Belknap's alleged waiver of his constitutional rights—is one of fundamental importance and hence any testimony relative thereto is clearly not unnecessary, "trivial" or "comparatively unimportant." The United States Supreme Court in *Miranda, supra,* warned that where the prosecution has the only means of making available corroborated evidence of such waivers, there is a heavy burden of proof on the prosecution. In the case at bar, the only evidence actually presented by the prosecution was completely contradicted by the defendant; and yet, even though the undersheriff was the only other available source of evidence relative to this dispute, the prosecutor failed to call him as a witness or to explain his absence. We are therefore of the opinion that the inference arising under the missing witness rule, as a result of the prosecution's failure to call the undersheriff, is well founded in the instant case.

 Finally, the state argues that Belknap failed to make any showing or contention that the testimony of any witness, who could testify as to any material facts, was being willfully withheld, relying on *State v. Baker,* 56 Wn.2d 846, 859, 355 P.2d 806 (1960), in which we held that

> The inference that witnesses available to a party and not called would have testified adversely to such party arises only where, under all the circumstances of the case, such unexplained failure to call the witnesses creates a suspicion that there has been a willful attempt to withhold competent testimony. *Wright v. Safeway Stores, Inc.,* 7 Wn.(2d) 341, 109 P.(2d) 542 (1941), 135 A.L.R. 1367.

*See, also, State v. Nelson,* 63 Wn.2d 188, 386 P.2d 142 (1963). The holdings in these cases, however, do not mean, as the state seems to imply, that in order to obtain the benefit of the missing witness rule in a criminal case one

must prove facts sufficient to establish a deliberate suppression of evidence by the prosecution with knowledge that such evidence, if produced, would support the defendant's case. Such conduct by the prosecution has, of course, been condemned in both federal and state courts as a denial of due process and thus a ground for the reversal of any conviction resulting therefrom. *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 Sup. Ct. 1194 (1963); *United States ex rel. Meers v. Wilkins,* 326 F.2d 135 (2d Cir. 1964); *People v. Fisher,* 192 N.Y.S.2d 741 (1958). Rather, the quoted language above simply means that one must establish such circumstances which would indicate, as a matter of reasonable probability, that the prosecution would not knowingly fail to call the witness in question unless the witness's testimony would be damaging. In other words, "the inference is based, not on the bare fact that a particular person is not produced as a witness, but on his non-production *when it would be natural for him to produce the witness if the facts known by him had been favorable."* (Italics ours.) Wigmore, *supra,* § 286. Proof of such circumstances, unlike proof of a deliberate suppression of material evidence, does not establish a denial of due process, but only gives rise to an inference unfavorable to the prosecution which may be drawn by the jury in its discretion. Considering the heavy burden *Miranda*[1] places on the prosecution to prove the validity of an alleged waiver, the close working affiliation between the prosecutor and the law enforcement agency of which the undersheriff is a member, the sharp conflict between the testimony of Belknap and the only officer actually testifying, and the fact that the undersheriff was the only other person present during the interrogation and therefore the only other source of relevant evidence—we conclude that, in view of the state's burden under *Miranda,* Belknap established those circumstances necessary to give rise to the inference of the miss-

---

[1]*Miranda* burdens apply to all trials commenced after June 13, 1966. *Johnson v. New Jersey,* 384 U.S. 719, 16 L. Ed. 2d 882, 86 Sup. Ct. 1772 (1966). Trial of this cause commenced November 28, 1966.

ing witness rule and that the trial court erred in failing to so instruct the jury.

In *Wright, supra,* at 347, we said that when the missing witness rule is applicable the jury should be instructed that they may draw an unfavorable inference against the party failing to call the missing witness, if they believe such inference is warranted under all the circumstances, and should not be instructed that there is a presumption against that party. Nevertheless, we further stated that: "The use of the term 'presumption' will not, however, be fatal to the instruction if the context shows that it was used in the sense of an inference which the jury were at liberty to draw." While we do not commend the language "it may be presumed" as used in Belknap's proposed instruction, we are of the opinion that such language in the context of the entire instruction may be construed as being "used in the sense of an inference." Upon retrial, if the state fails to either call the undersheriff or explain his absence, thereby invoking the missing witness rule, Belknap's proposed instruction would be better phrased if it more closely followed the indications in *Wright,* as stated above.

Belknap's second assignment of error is that the court erred in allowing into evidence the captain's testimony concerning the alleged admission made by Belknap during the interrogation. Belknap's argument with respect to the admissibility of his alleged admissions in effect involves two distinct questions: (1) did, in fact, Belknap make the alleged admissions; and (2) if so, did he knowingly, voluntarily and intelligently waive his constitutional rights prior to making such admissions, or more precisely, did the prosecution meet its burden of proving such a waiver. We are of the opinion that the first question is simply a disputed question of fact which raises no constitutional issues and to which the *Miranda* holding with respect to the state's burden of proof is not applicable. With respect to the second question, Belknap makes two assertions of facts occurring during the pretrial confession hearing which, if true, could render the alleged admission inadmis-

sible under the *Miranda* holding: (1) The sheriff's captain allegedly continued the interrogation after Belknap invoked his right to remain silent and his right to counsel. The Supreme Court in *Miranda* was unequivocal in holding that

> The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned. (p. 444)

(2) The sheriff's captain allegedly indicated to Belknap that charges might not be brought if he cooperated and made a statement. *Miranda* specifically held that "any evidence that the accused was . . . cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." (p. 476) "Cajolery" may be defined as a deliberate attempt at persuading or deceiving the accused, with false promises, inducements or information, into relinquishing his rights and responding to questions posed by law enforcement officers. As already indicated, both of the aforementioned questions involved in Belknap's argument are sharply disputed and the only available evidence is the conflicting testimony of the accused and one police officer.

In cases prior to *Miranda* involving a factual dispute, the resolution of which determined the admissibility of a confession or admission, we consistently applied the following rules: (1) where the trial court clearly weighed the conflicting evidence before it, this court on appeal will not disturb the trial court's determinations, if supported by substantial evidence, as to the admissibility of the statement. *State v. Nesrallah*, 66 Wn.2d 248, 401 P.2d 968

(1965); *State v. Burgess,* 71 Wn.2d 617, 430 P.2d 185 (1967); (2) "substantial evidence" is defined as that character of evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed. *Bland v. Mentor,* 63 Wn.2d 150, 385 P.2d 727 (1963); (3) where the trial court has found that the testimony of police officers is entitled to greater credibility than that of the accused and therefore has chosen to believe the officers' version, the function of this court is not to re-evaluate the relative credibility of the witnesses' testimony. *State v. Reed,* 56 Wn.2d 668, 354 P.2d 935 (1960); and (4) while significant weight is attached to the findings of fact relative to the voluntariness of a confession, nevertheless this court has a duty and obligation, where basic constitutional rights are involved, to carefully review the record brought before us and determine therefrom whether the bounds of due process requirements have been exceeded. *State v. Hoffman,* 64 Wn.2d 445, 392 P.2d 237 (1964).

But for the holding in *Miranda,* we would have no hesitancy in sustaining the trial court's findings with respect to both questions involved in Belknap's second assignment of error according to the rules summarized above as applied in our prior cases. The problem posed in the instant case, however, is what effect, if any, the burden of proof requirement established by *Miranda* has on these rules as they apply to each of the two questions raised by Belknap's argument.

The thrust of *Miranda* is aimed at the state's burden of proving that the appropriate warnings were given and that the accused effected a valid waiver, and does not apply to the state's burden of proving that the confession was in fact made. Thus, we do not believe *Miranda* in any way affects the rules summarized above as they apply to the first question and hence we cannot overturn the trial court's findings that Belknap did make the alleged admissions.

The second question raised by Belknap's argument, involves whether or not the prosecution met its burden of

proving the validity of Belknap's alleged waiver of his rights. This question is clearly within the scope of the constitutional requirements as defined in *Miranda*. The issue here is not whether *Miranda* renders unconstitutional those rules which we have traditionally followed in reviewing a trial court's findings with respect to the admissibility of an alleged confession or admission; clearly it does not. We recognize that in cases prior to *Miranda* we were primarily concerned with the voluntariness of a confession, whereas after *Miranda*, we must, in addition, consider whether the accused was informed of his constitutional rights and whether he thereafter knowingly and intelligently waived those rights prior to making the statement. Nevertheless, the rationale behind these rules prior to *Miranda* is equally applicable to post-*Miranda* cases. Neither is the function of this court to retry factual issues or to re-evaluate the credibility of witnesses, nor are we well equipped to do so; and this is particularly true where, as here, the only evidence relative to the factual dispute is the contradictory testimony of two witnesses. As we said in *In re Martinson's Estate*, 29 Wn.2d 912, 920, 190 P.2d 96 (1948):

> A trial judge is much more than a commissioner named to take and collect evidence in a case. He is a judicial officer provided for by our constitution, and the laws of this state. He has had years of experience as a trial lawyer, and as a judge. . . . The credibility of the witnesses, and the force of their testimony, and the weight that should be attached to it, are all matters concerning which the trial judge is the best judge.

Succinctly stated, the real issue in the instant case is whether, in light of *Miranda's* placing a heavy burden of proof on the prosecution, we must now require a greater quantum and quality of proof than we did in pre-*Miranda* cases when we apply the "substantial evidence" test upon review of a trial court's findings as to the validity of an accused's waiver.

The Supreme Court in *Miranda* was unequivocal in holding that "a *heavy burden* rests on the government to dem-

onstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (Italics ours.) (p. 475) The court was equally clear in expressing its reasons for placing the burden of proof on the prosecution. "Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available *corroborated* evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." (Italics ours.) (p. 475)

As to the quantum and quality of proof required to prove a valid waiver, *Miranda* holds that "This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst,* 304 U.S. 458 (1938), and we reassert these standards as applied to in-custody interrogation." (p. 475) In *Johnson v. Zerbst,* 304 U.S. 458, 464, 82 L. Ed. 1461, 58 Sup. Ct. 1019, 146 A.L.R. 357 (1938), it was stated that ". . . 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' " Moreover, even prior to *Miranda* it was well established that for the prosecution to meet its burden of proving a valid waiver: (1) "convincing evidence" must be presented, *Judd v. United States,* 190 F.2d 649 (D.C. Cir. 1951); *Nelson v. United States,* 208 F.2d 505 (D.C. Cir. 1953); (2) "clear and positive testimony" must be produced, *Judd* and *Nelson, supra;* and (3) the government's burden of proof is greater where the alleged waiver was given while the accused was under arrest, *Judd, supra.* Some courts have gone even further and required that the trial court must find admissibility beyond a reasonable doubt before the confession may be submitted to the jury. *People v. Huntley,* 15 N.Y.2d 72, 204 N.E.2d 179 (1965). *But see contra, People v. Scott,* 29 Ill. 2d 97, 193 N.E.2d 814 (1963); *Clifton v. United States,* 371 F.2d 354 (D.C. Cir. 1966), *cert. denied* 386 U.S. 995[2], 18 L. Ed. 2d 341, 87 Sup.

---

[2]*Clifton* is discussed in 43 Notre Dame Lawyer 115 (Oct. 1967) in a casenote reviewing this issue.

Ct. 1312. The latter view seems to be predominate and correct.

Furthermore, in accordance with its recognition of the high standards of proof required to prove a valid waiver of constitutionl rights, *Miranda* is emphatic that no presumptions are available to aid the prosecution in its attempt to prove a valid waiver of the rights to counsel and to remain silent. The court specifically indicates that a waiver will not be presumed: (1) simply from the silence of the accused after the warnings are given (p. 475); (2) simply from the fact that a confession was in fact eventually obtained (p. 475); (3) if the individual answers some questions or gives some information on his own initiative prior to invoking his right to remain silent when interrogated (p. 475); (4) if the accused fails to ask for the assistance of an attorney (p. 470); and (5) from a silent record (p. 475).

Moreover, *Miranda* specifically points out certain factual criteria which should be considered in determining the validity of a waiver, including the existence of tricks, cajolery, lengthy interrogation, or incommunicado incarceration prior to the waiver, as well as the time interval between the alleged waiver and the giving of a statement.[3] But these factual criteria are of little value in determining whether the police in a particular case have followed the mandate of *Miranda*, if the only proof relative to such criteria is the testimony of one interrogating officer—the very person who allegedly violated the accused's constitutional rights. If in fact an accused's waiver is not valid, often his only means of proving the invalidity is his own testimony to that effect. But a review of cases, in which the issue of the admissibility of a confession had to be resolved on the basis of a 'swearing contest," indicates that almost invariably the police officer was held by the trial court to be more credible than the accused. In contrast to the accused's inadequate means of establishing evidence, the police, when interrogating the accused within the confines of a station house, have

---

[3]For numerous other criteria which may be considered, see 19 Am. Jur. Proof of Facts 91.

readily available numerous methods and techniques of establishing corroborating testimony and independent supporting evidence, *e.g.,* (1) the officers, in addition to the interrogating officer, who may witness the accused's waiver; (2) stenographers; (3) tape recordings; (4) motion pictures; and (5) video tape recordings.

With respect to certain of the factual criteria mentioned in the preceding paragraph, the court in *Miranda* stated at 476:

> *Whatever the testimony of the authorities* as to waiver of rights by an accused, the fact of lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights. . . . Moreover, *any evidence* that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. (Italics ours.)

The language quoted above, particularly as emphasized, has been interpreted by some authorities to mean:

> [T]hat confessions achieved by custodial interrogation are regarded with so much distrust by the *Miranda* justices that something resembling a presumption against their admissibility is taking shape. Though calling this a presumption of police misconduct and perjury might not be accurate, and would doubtless be resented, it should be recognized that the evidentiary problem of proving a valid waiver of *Miranda* rights is not much different from what it would be if such a presumption existed. 19 Am. Jur. Proof of Facts 72.

*See also* Justice White's dissenting opinion, *Miranda, supra,* at 526; B. James George, Jr., Constitutional Limitations on Evidence in Criminal Cases, Institute of Continuing Legal Education, Ann Arbor, Michigan, 1966, p. 120. While we do not particularly subscribe to this interpretation, we do believe that the Supreme Court intended a mandate to require the adoption of more credible and sophisticated techniques of proof than was formerly the case. So long as interrogation takes place in isolated circumstances, with no one present who is either favorable to the accused or suited for the role of a neutral and impartial observer, some

firmer guaranty that constitutional rights have been observed will normally be necessary than can be provided by a mere "swearing contest" between the accused and one interrogating police officer.[4]

■ Considering the facts as presented in the case at bar, we cannot hold that the prosecution has met the burden of proving the validity of Belknap's alleged waiver as required by the holding in *Miranda*: (1) the admission was made while the defendant was in police custody within the confines of the police station; (2) presumably the police had both the opportunity and the means readily available to establish substantial corroborating evidence; (3) the only evidence presented by the prosecution consisted of the testimony of one interrogating officer; (4) the officer's testimony was neither corroborated by other testimony nor supported by other independent evidence; (5) the officer's testimony was completely contradicted by the defendant; and (6) a second officer, who was the only other person present during the interrogation, was not called as a corroborating witness by the prosecution nor was his absence explained, and in the instant case this last element may be deemed determinative.

Belknap next makes several assignments of error all relating to the adequacy of the trial court's instructions relative to the specific intent necessary for the crime of attempted escape. Since we believe these assignments are without merit we will but briefly discuss them. The core of Belknap's argument on this point is that the jury should have been specifically instructed that intent could not be inferred from an overt act alone.

---

[4]Because the pressures on the accused are substantially greater and the means of establishing corroborating evidence are more extensive within the relatively controlled environment of the station house, whereas the situation outside in the "field" is often confused and of an emergency nature, the prosecution's burden of proving the validity of waivers allegedly made in the "field" may be lighter than in the case of "station house" waivers. Kamisar, Yale: *"A Dissent from the Miranda Dissents: Some Comments on the 'New' Fifth Amendment and the Old 'Voluntariness' Test."* 65 Mich. L. Rev., 59, 61 (1966). 19 Am. Jur. Proof of Facts 69.

■ The jury was instructed that they had to find circumstances "such as would authorize them to infer the intent with which the acts were done." Such circumstances included the evidence, as described earlier, of defendant's activities in connection with the escape attempt. Reading together the cases of *State v. Leach,* 36 Wn.2d 641, 219 P.2d 972 (1950), and *State v. Lewis,* 69 Wn.2d 120, 417 P.2d 618 (1966), relied upon by Belknap and the state, respectively, we can derive the following rule: where a defendant's acts are patently equivocal, criminal intent may not be inferred from the overt acts alone; however, specific criminal intent may be inferred from the conduct where it is plainly indicated as a matter of logical probability. Considering all the facts and circumstances surrounding the attempted escape, we are of the opinion that Belknap's conduct was not patently equivocal; rather, his conduct was such that intent could be inferred therefrom as a matter of logical probability. Furthermore, Belknap's acts were not merely preparation as he contends; the preparation stage had long since passed and the attempt had commenced. Thus, the trial court did not err in refusing to give the instruction requested by Belknap or in giving the instruction which referred to the intent to aid and abet and to the overt acts from which this requisite intent could be found.

Belknap further argues that, because as a prisoner he had no choice but to be immediately present at the scene of the crime, the trial court was in error in instructing the jury that proximity to the scene with others makes the acts of one the acts of each of the others. However, as pointed out by the state, the instruction referred only to persons engaged "in a common criminal escapade" and required the jury to distinguish those prisoners who merely approved of or acquiesced in the attempt from those who aided and abetted and thereby became principals.

As his final assignment of error, Belknap contends that the trial court abused its discretion in denying his motion for a separate trial. Belknap argues that the following circumstances created a danger that the jury would find him

guilty by association or by the process of elimination: All the defendants were incarcerated in the same confined cell area; someone had unquestionably cut a hole in the jail floor; the interests of the defendants were directly opposed as they all plead not guilty thereby tending to incriminate their codefendants.

The granting of separate trials under RCW 10.46.100 is discretionary with the trial court and this court will not overturn a trial court's determination except in the case of manifest abuse of discretion. *State v. Courville,* 63 Wn.2d 498, 387 P.2d 938 (1963). The fact that the interests of all the participants in a crime conflict does not require that the court grant each of several participants a separate trial. Such conflicts invariably will be present "where two or more persons are tried for the same crime . . . ." and if such conflicts are "regarded as requiring a separate trial, it is at once plain that the statute is rendered nugatory, and joint trials will be the exception and not the rule. But such was not the intent of the legislature." *State v. Clark,* 156 Wash. 47, 51, 286 Pac. 69 (1930). The trial court did not abuse its discretion in refusing to grant Belknap a separate trial.

Reversed and remanded for new trial.

FINLEY, C. J., HUNTER and HAMILTON, JJ., and OTT, J. Pro Tem., concur.

FINLEY, C. J. (concurring specially)—I have signed and concur in the majority opinion. In my judgment it is a realistic and accurate evaluation and application of the law, particularly as construed presently by the United States Supreme Court in *Miranda v. Arizona,* 384 U.S. 436 (1966). My purpose in concurring specially is not to detract from the majority decision in any way, but to place in proper perspective the basis of my concurrence. My specific concern is with the majority's disposition of defendant-Belknap's second assignment of error, *viz.,* the propriety of allowing into evidence testimony of the sheriff's captain concerning alleged admissions made by Belknap during inter-

rogation. I wish to discuss whether Belknap ought to be found to have waived his constitutional rights prior to making the alleged admissions, and whether in any event the matter of his waiver ought to provide a basis for a new trial under the facts in the instant case.

As indicated by the majority, the evidentiary dispute over whether Belknap did or did not waive his constitutional rights may be simply and aptly characterized as a "swearing contest" in which Belknap says he did not waive his rights and the captain says he did. There is no corroborating evidence for either side except whatever implications or presumptions may be drawn from the silence of a second officer who was present during Belknap's interrogation but was not put on the stand as a witness by the state. *Under these circumstances,* I am convinced the United States Supreme Court has made it quite clear that it cannot be said Belknap waived his constitutional rights. *Miranda v. Arizona, supra.* Although quoted in part by the majority, the following passage from *Miranda* is set forth here to demonstrate the inexorability of the foregoing conclusion:

If the interrogation continues without the presence of an attorney and a statement is taken, a *heavy burden rests on the government* to *demonstrate* that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. . . . This Court has always set *high standards of proof for the waiver of constitutional rights . . . and we re-assert these standards as applied to in-custody interrogation.* Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, *the burden is rightly on its shoulders.*

An express statement that the individual is willing to make a statement and does not want an attorney followed *closely* by a statement *could* constitute a waiver. But a valid waiver will *not* be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually ·obtained. . . .
 . . . .

Moreover, where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated.

*Whatever the testimony of the authorities* as to waiver of rights by an accused, the fact of lengthy interrogation or *incommunicado incarceration* before a statement is made is *strong* evidence that the accused did *not* validly waive his rights. In these circumstances the fact that the individual eventually made a statement is consistent with the conclusion that the compelling influence of the interrogation finally forced him to do so. *It is inconsistent with any notion of a voluntary relinquishment of the privilege.* Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a *fundamental* with respect to the Fifth Amendment privilege *and not simply a preliminary ritual to existing methods of interrogation.* 384 U. S. at 475-76. (Italics mine.)

The thrust of the foregoing commentary is plain and unambiguous. There is a heavy burden upon the state to prove waiver if statements obtained during incommunicado interrogation, such as in the instant case, are to be admissible as evidence. The prosecution did not meet this burden with respect to defendant-Belknap's alleged in-custody admissions and a new trial must therefore be granted.

The decision of the court in *Miranda v. Arizona, supra,* is the law of the land. It is, or should be, a truism of absolute quality that state court judges, and others, are duty-bound to uphold and apply the law as construed by the court. Even so, in my judgment some comment is appropriate relative to what I believe are some disturbing jurisprudential and societal ramifications and consequences of *Miranda.* For although I must and do support the decision judicially, I disagree with it, at least philosophically or in an essentially academic sense.

As state law is affected more and more by a seemingly ever-expanding interpretation and application of the fed-

eral constitution, some may tend to forget the legal niceties upon which intervention of the United States Supreme Court is predicated in matters of state criminal law administration. The usual theoretical legal basis, as in *Miranda,* for applying the principles of some of the federal constitutional amendments to the states is the "due process" clause of the Fourteenth Amendment. The *Miranda* rules are made applicable to the states because of a composite, majority judgment of the members of the Supreme Court that such rules must be applied to accord "due process of law" for individuals accused of crimes.

However, there is nothing thaumaturgic about the term "due process of law." Its substance does not spring from timeless oracles. Rather, the words "due process of law" are (to paraphrase a general philosophical observation of Mr. Justice Holmes) merely the "skin of ideas." In very large measure due process of law, in my considered opinion, represents personal value-judgments made by different jurists at different times under different circumstances. According reasonable and rational validity to the foregoing postulates, there should be no inference of contumacy or heresy in critically analyzing and evaluating any and all judicial declarations which ostensibly or purportedly provide additional substance to the shifting and varying content of those fundamental social values characterized by the court as "due process of law."

When one speaks of the rights of society, he is in a sense speaking of the composite or collective rights of individuals. But this does not mean that the composite rights of individuals as a social body can be protected, as the *Miranda* decision would appear to suggest, by protecting the rights of individuals as discrete entities or beings. Equating the sum of the parts with the whole—and vice versa—may work well in the field of mathematical logic, but this is not necessarily so in the area of human relationships. The interests, needs, wants, and values of the group often differ from and conflict with those of its component parts, and cognizance should be taken by the judiciary of these differ-

ences and conflicts when developing and enunciating due process rights.

Whenever an individual is accused of committing a crime, two diametric forces are set in motion. On the one hand there are the rights which society affords individuals as individuals to protect them from overbearing and oppressive actions by government. On the other hand there are the rights which society reserves for itself, that is, for individuals as a whole, in the interest of protection and security from attack by individual transgressor members of society. In a sense, each is the obverse of the other. Obviously, neither set of rights can be given absolute, unqualified application without denegating the other. Thus, it is a prime function of the law and the courts to effect a rational accommodation of these two competing social forces so that both are accorded reasonable effectiveness.

Viewed realistically, courts have traditionally reconciled or balanced competing social forces in making value-judgments as to which should, under particular circumstances, be given the greater effect. Perhaps the judicial function, in Benthamite-Mill terminology, seeks to ascertain and promote "the greatest happiness of the greatest number." But, in the criminal law field it seems to me that courts are now required to overlook or ignore this legal balancing mechanism and instead concentrate on maximizing the individual rights of criminal defendants.

In the instant case defendant-Belknap was convicted of attempting to escape from the Spokane County jail. He was in the jail as a transferee from the Washington State Penitentiary. He had been confined in the penitentiary because of a grand larceny conviction. It would seem apparent that society is vitally interested in seeing that criminal offenders in custody, such as defendant, do not escape confinement. Not only is society interested in being protected from further depredations of such offenders, but society is also interested in the rehabilitation of criminal offenders. Yet it is precisely these vital social interests which the Supreme Court's decision in *Miranda* now seems to frustrate. We are

obliged to grant a new trial to a convicted felon whom no reasonable man can doubt attempted to escape jail. This action is required, not because statements which he allegedly made were unreliable or untrue, not because there is even a slight suggestion he was improperly treated, but because the state has not met what in my opinion is an inordinately heavy burden of showing that what are termed the *"Miranda* warnings" were given and that defendant-Belknap waived his rights pursuant to these warnings.

Due process considerations encompass not only fundamental individual rights but fundamental societal rights as well. It is as judicially inappropriate to ignore the one as it is to ignore the other. In my judgment, the Supreme Court in *Miranda* gave little significant attention to the societal aspects of due process.[5] It seems to me quite likely that *Miranda* will substantially increase the difficulty of obtaining convictions. This was emphasized in the dissent of Mr. Justice White. 384 U.S. at 541. Perhaps any such worsening of the interests of organized society would not be objectionable if it were necessary to prevent individuals accused of crimes from being subjected to oppressive, inquisitorial interrogation. The fact of the matter is, however, that there is little if any statistical data or other comprehensive, reliable information which suggests that such improper interrogations take place on a wide-ranging scale in all police departments throughout the land. Obviously, some policemen in some police departments in some cities under some circumstances violate generally-recognized standards of fair play. But, when and where violations take place, there are better ways of dealing with them than reversing criminal

[5]It is ironic to me that the Supreme Court, which has so studiously ignored this concept of due process in criminal cases, has carefully applied it elsewhere. For example, in *Zemel v. Rusk,* 381 U.S. 1, 14 (1965), a case concerning restrictions on travel to Cuba, Mr. Chief Justice Warren, author of *Miranda,* stated that the right to travel is not absolute under the Fifth Amendment because "[t]he requirements of due process are a function not only of the extent of the governmental restriction imposed, but also of the extent of the necessity for the restriction."

convictions. Exercise of contempt of court powers, establishment of high level state commissions on criminal law administration, and provisions for effective civil redress would serve far better as modes of "policing the police" than defeating governmental or society's efforts to protect itself from individual transgressors.[6]

There is a second aspect of *Miranda* which also troubles me deeply. My reading of the case indicates that failure to meet its strict requirements is per se harmful error and thus grounds for reversal.[7] In other words, the defendant has a right to a new trial, regardless of the impact of such error on his first trial. In my judgment, this is an illogical and inappropriate juristic assumption. Appellate courts constantly perform the function of evaluating harmful effects which improper evidence may have had on civil trials and there is no reason why they should not be competent and trusted to perform this function as to criminal trials. *See State v. Wells,* 72 Wn.2d 492, 500 n.4, 433 P.2d 869, 873 n.1 (1967) (concurring opinion). This was the approach apparently endorsed and employed by the Supreme Court when it decided *Crooker v. California,* 357 U.S. 433 (1958) ("sum of the circumstances" test) and *Betts v. Brady,* 316 U.S. 455 (1942) ("totality of the evidence" test), and I find it regrettable indeed that the court has now chosen to disregard the wisdom of the judicial approach of these cases.

That results under a "harmful per se" rule are illogical and undesirable is graphically illustrated in the instant case. The physical evidence and testimony of other cellmates introduced at defendant-Belknap's trial would be enough upon retrial to convince any jury of reasonable minds *beyond a reasonable doubt* that the defendant attempted to escape jail. The prejudicial effect on the trial of

---

[6]See reference to alternative methods of regulating police activities in R. Finley, *Who is on Trial—The Police? The Courts? Or the Criminally Accused?,* 57 J. Crim. L.C. & P.S. 379 (1966).

[7]The court stated in *Miranda,* 384 U.S. at 479: "[U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation *can* be used against him." (Italics mine.)

the interrogating officer's statements concerning alleged admissions of Belknap was insignificant. Surely it would be more rational to hold judicially that, under the test suggested in *Chapman v. California*, 386 U.S. 18, 21-24 (1967), no new trial is necessary because the error which resulted from admission of the officer's statements into evidence was harmless *beyond a reasonable doubt. See* A. Holtzoff, *Shortcomings in the Administration of Criminal Law*, 17 Hastings L.J. 17 (1965).

I suppose it is rather superfluous to add that, were I free to choose, I would not follow the majority's decision in the instant case but, on the basis of a rule of harmless error, would instead affirm defendant-Belknap's conviction. But, I am not free to choose, for the Supreme Court has exercised *its* discretion. A choice has been made by the court striking a balance between liberty and order and between the one and the many. Any discretion or choice which I may have had has been preempted. Thus, the majority opinion in the instant case aptly states the law, and I must fully, albeit unhappily, concur.

May 31, 1968. Petition for rehearing denied.